Thomas W. SOWELL and Lillian K. Sowell, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 19090.

United States Court of Appeals Fifth Circuit.

April 25, 1962.

---

Leland E. Fiske, Dallas, Tex., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, John B. Jones, Jr., Acting Asst. Atty. Gen., Melva M. Graney, Earl J. Silbert, Attys., Dept. of Justice, R. P. Hertzog, Acting Chief Counsel, John M. Morawski, Atty., I. R. S., Washington, D. C., for respondent.

Before BROWN, WISDOM, and BELL, Circuit Judges.

WISDOM, Circuit Judge.

This is a man-bites-dog case. Here, taxpayers—not disinterestedly, of course—contend that they received income. The Commissioner denies that they did.

Thomas W. Sowell and his wife petition for review of an adverse decision by the Tax Court.[1] The prime question before us is whether the taxpayers constructively received the income from an oil lease in 1955, 1956, and 1957. We hold that they did, and reverse the decision below.

■ The taxpayers and J. B. Sowell were the sole stockholders of the Riverside Production Company, which owned a seven-eighths working interest in an oil and gas lease in Texas known as the Luse Lease. In 1942 they liquidated the corporation and conveyed legal title to the lease to H. C. Moseley under an oral agreement giving Moseley a 1/5th interest in the lease. The taxpayers retained a 2/5ths interest and J. B. Sowell a 2/5ths interest. Moseley was to operate the lease and remit to the other owners their share of the net income. This he did faithfully for twelve years. In 1954, however, Moseley had financial problems which he attempted to solve by treating the lease as if he were its sole owner. He borrowed $131,800 from the Citizens National Bank of Tyler, Texas in 1954 and an additional $36,000 from the First National Bank of Dallas the following year. He secured both debts by a pledge

1. The Tax Court held that the taxpayers owed deficiencies for the taxable years 1955, 1956, and 1957, in the respective amounts of $1,312.20, $1,032.54, and $1,378.74, T. C. Memo 1961–115.

of the Luse Lease and an assignment of the production income from it. It is undisputed that although Moseley acted without the knowledge or authority of the taxpayers or J. B. Sowell, they are estopped, under Texas law, to deny the validity of his pledge and assignment to the banks because of their having put legal title to the Luse Lease in him.[2] During 1955, 1956, and 1957 the taxpayers' share of the income from the lease was paid to the banks and applied on Moseley's loans. Moseley repaid part of the 1955 income to the taxpayers and he executed a note for the remainder. During 1955 he became hopelessly insolvent, and the taxpayers have been unable to recover anything further from him.[3]

The petitioners, who use a cash-basis accounting system, reported the income from the lease during the taxable period as constructively received and deducted the depletion allowance on it. They then deducted as a bad debt the amounts received by the bank and not repaid by Moseley. The deductions overlap each other and exceed the amount of the income. If the petitioners are not taxable on the lease income, they are not entitled, as they concede, to either of the deductions.[4] The Commissioner asserts that the money paid to the bank was not taxable income to the petitioners. He does not dispute either deduction, if the taxpayers constructively received the income.

The Commissioner argues that there was no constructive receipt, because the payments were not set apart or credited to the taxpayer, subject to his demand. 2 Mertens, Law of Federal Income Taxation, Sections 10.01–10.03. The taxpayers' relation to the income, so the argument runs, does not satisfy any of the tests of income receipt postulated by the Supreme Court; the taxpayers received no economic benefits from the diversion of the payments. They did not enjoy any of the privileges and benefits attributable to ownership.[5] They had no control and dominion over the funds.[6] They derived no economic value from them.[7] The Commissioner relies especially on Alsop v. Commissioner, 2 Cir., 1961, 290 F.2d 726 and Rossi v. Commissioner, 41 B.T.A 734.

■ The facts on which these postulates are based have little, if any, similarity to the unusual facts in this case. But before discussing the principles we consider applicable here, we point out that Alsop and Rossi are distinguishable. Generally, receipt of income by an agent is equivalent to receipt by the principal and the income is actually or constructively received by the principal. In both Alsop and Rossi an agent of the taxpayer diverted it to his own use. In Alsop the court held that "this rule [of constructive receipt] can hardly apply where the agent of a cash basis taxpayer spirits away income of whose receipt the taxpayer never knew". In Rossi the Tax Court held that the agency had terminated before receipt of the money and therefore there could be no constructive re-

---

2. Home Owners Loan Corporation v. Netterville, Tex.Civ.App., 110 S.W.2d 628, rev'd on other grounds, 134 Tex. 30, 132 S.W.2d 93; National Bond and Mortgage Corporation v. Davis, Tex.Com.App., 60 S.W.2d 429.

3. The Tax Court found that Moseley became insolvent in 1955; that the taxpayers have no hope of any recovery from him.

4. Section 166 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 166 allows a deduction for any business debt that becomes worthless during the business year. Treasury Regulation § 1.166–1(e) (1959) provides: "Worthless debts arising from

unpaid wages, salaries, fees, rents, and similar items of taxable income shall not be allowed as a deduction under section 166 unless the income such items represent has been included in the return of income for the year for which the deduction as a bad debt is claimed or for a prior taxable year."

5. Burnet v. Wells, 1933, 289 U.S. 670, 678, 53 S.Ct. 761, 77 L.Ed. 1439.

6. Helvering v. Clifford, 1940, 309 U.S. 331, 335, 60 S.Ct. 554, 84 L.Ed. 788.

7. Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, rehearing denied 343 U.S. 952, 72 S.Ct. 1039, 96 L.Ed. 1353.

ceipt based on agency. In both these cases the owners suffered a loss from embezzlement without any economic benefit. That is not the case here.

In 1942 the petitioners acquired an interest in the Luse Lease. Their economic interest in the lease was not divested when title was placed in Moseley's name for convenience. Ownership of an economic interest does not depend on legal title. Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Estate of Weinert v. Commissioner, 5 Cir., 1961, 294 F.2d 750. For twelve years before Moseley's misappropriation, the Luse Lease produced depletable income which the Sowells reported. They did not lose their economic interest when Moseley pledged it as security for his loan; Moseley could not and did not purport to transfer this interest when he assigned to the bank the proceeds representing the Sowells' royalties.

Unlike the unfaithful agents in Alsop and Rossi, Moseley did not just intercept current revenue as the funds came to his hands. The significant fact in this case is that Moseley accomplished his misappropriation by burdening the property with a valid mortgage. This was, of course, a detriment to the owners, but the tax controversy is not over that detriment; it is over the producing income under the lease. Every payment of that income to the bank reduced the burden, increased the owners' equity, and hastened the day when the owners would have unfettered control over the property. Accepting the validity of the mortgage or pledge under Texas law, as we must, it is unrealistic to contend that payments made to reduce the debt were of no economic benefit to the owners of the burdened property.

▪ The controlling principle is that income applied on a debt is constructively received. This principle is often applied in oil and gas tax cases. Thus, in Reynolds v. McMurray, 10 Cir., 1932, 60 F.2d 843 the leases in question were originally owned by Armstrong who mortgaged the property. Later he sold a fractional interest to McMurray. McMurray, however, was not personally liable for the mortgage, although the property remained subject to the mortgage. McMurray agreed to advance Armstrong's share of the development costs, to be recouped only from the income. The court held that McMurray constructively received as taxable income the income applied on the mortgage debt. "Profits", the court said, "which would constitute income if paid directly to a person are also income to him if paid pursuant to his agreement to a third person to discharge his obligation to such third person". The important point, as in this case, is that payments were applied in discharge of a mortgage on property owned by the taxpayer. We see no distinction in principle between the application of such payments to the debt in Reynolds v. McMurray (where the parties themselves burdened the property by a binding contract), and the application of the payments to the debt in the case at bar (where the owners' agent and nominee burdened the property by a binding contract). In both cases the income was paid to a mortgagee under an existing obligation for which *the property* was liable. See Crane v. Commissioner, 1947, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301, indicating that when a person purchases property subject to an existing mortgage debt, he constructively receives income paid to reduce the mortgage although he has not assumed personal liability on the mortgage and was not initially responsible for placing the mortgage on the property.

▪ In T. K. Harris v. Commissioner, 6 Cir., 1940, 112 F.2d 76, the Court held that the taxpayer constructively received income from proceeds from producing gas wells when the proceeds were applied during the taxable year on the purchase of each completed well. In that case the taxpayer contracted with a gas company to drill wells on his land, the company to be paid solely out of the income from the wells. See also Commissioner of Internal Revenue v. J. S. Abercrombie Co., 5 Cir., 1947, 162 F.2d 338 and Prater v. Commissioner, 5 Cir., 1959, 273 F.2d 124.

Whatever else may be said about Abercrombie and Prater, there can be no question as to the soundness of this Court's position in those cases that oil and gas income is constructively received by a taxpayer when it is applied in payment of a debt for which his economic interest is liable. And see Commissioner of Internal Revenue v. Slagter, 7 Cir., 1956, 238 F.2d 901; Whitwell v. Commissioner, 5 Cir., 1958, 257 F.2d 548.

Under James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 and Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, Moseley had a taxable gain in the year of his misappropriation. We believe that this gain was the amount of his loan from the bank. Moseley raided principal. The dominant feature of his transaction with the bank was its immediate finality. Once he made the pledge and received his loan from the banks, the liability irrevocably attached to the lease. Since the other owners were estopped to contest the validity of the pledge, the mortgage took effect with as full force as if they had participated in the transactions personally. The value of their economic interest in the lease was immediately reduced by the amount of the liability, and subsequent earnings from the lease benefited them by reducing the liability. Although Moseley also assigned the income for the repayment of his loans, this is the less significant aspect of his machinations since once the liability was placed upon the lease the income (or other funds) would have to be used to clear it, whether Moseley had expressly provided for this or not. We conclude therefore that the appellants' initial loss was one of principal. This result is buttressed by the fact that neither Moseley nor the banks could properly be viewed as having received the income. Moseley received all that he could derive from the deal through his loans; thereafter it was a matter of indifference to him whether the lease produced enough income to pay off the indebtedness or not. And to the banks, as to the usual mortgagee, the income payments were simply a return of capital. The income necessarily was received by *someone,* and the process of elimination points to the taxpayers.

 Summarizing, the common sense view of the situation coincides with the legal technicalities: "Income is taxable to the owner of the property producing same". Commissioner of Internal Revenue v. J. S. Abercrombie Co., 5 Cir., 1947, 162 F.2d 338. Tax decisions and equities sometimes are at cross-purposes. The result we reach in this case, however, is fair and equitable, for it allows depletion to the persons whose assets were wasted.

The judgment below is

Reversed.