**ESTATE of Wallace P. GEIGER, Deceased, Warren G. Dunkle, Executor, and Burnice I. Geiger, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 17864.**

United States Court of Appeals
Eighth Circuit.

Oct. 20, 1965.

Certiorari Denied Jan. 24, 1966.

See 86 S.Ct. 620.

determined by Federal Law. Nesmith v. Alford, supra, n. 8; 15 Am.Jur.2d 453, Civil Rights § 67.

Melford M. Lothrop, Sioux City, Iowa, for petitioners and filed brief with Franklin E. Gill, Sioux City, Iowa.

Harold C. Wilkenfeld, Atty., Tax Division, Dept. of Justice, Washington, D. C., for respondent and filed brief with John B. Jones, Jr., Acting Asst. Atty. Gen., and Lee A. Jackson, Norman Sepenuk, and Lawrence B. Silver, Attys., Dept. of Justice, Washington, D. C.

Before BLACKMUN and RIDGE, Circuit Judges, and REGISTER, District Judge.

BLACKMUN, Circuit Judge.

The primary issue here is whether funds embezzled during the calendar years 1954–1959, inclusive, qualify as income for federal income tax civil deficiency purposes.

The taxpayers are Burnice I. Geiger and her husband, Wallace P. Geiger. They filed calendar year joint returns. Mr. Geiger died in 1961. The Tax Court held that the amounts of tax returned by the Geigers for the six years in question were deficient in the aggregate amount of $183,734.34.[1] The taxpayers petition for review. Judge Withey's opinion, not reviewed by the full court, is T. C. Memo 1964–153.

The background facts are not disputed. They are established by admissions in the pleadings and by stipulation.

Mrs. Geiger, when a young girl of 18 or 19 and after attending college for one year, was employed in 1921 by the Sheldon National Bank, Sheldon, Iowa, as a bookkeeper. She had had no prior banking training. In 1930 she was placed in charge of the bank's bookkeeping department and became assistant cashier. She continued to work with the bank until January 16, 1961, a period of approximately 40 years.

During the last 30 years of her employment Mrs. Geiger without authority and unlawfully, as the Tax Court found, "appropriated and converted money of the bank to her own use". She used an average of about $1,000 a month for transactions on the "Board of Trade". She also effected transfers of funds to various individuals and firms, including herself, her husband and her husband's business. This was accomplished either by crediting the accounts of depositors without having received deposits from them or by honoring and then withholding checks drawn on the bank by persons who maintained insufficient balances or none at all. Mrs. Geiger concealed her conduct by pulling out ledger sheets for enough accounts to cover the existing shortage whenever bank examiners were expected. Apparently, except for Northern Biochemicals Corporation and its president, both of whom received diverted funds in 1960 and 1961 (years not at issue here), and except for herself and the Geiger accounts, those who were the beneficiaries of these manipulations thought they were the fortunate recipients of "loans and gifts" from Mrs. Geiger. According to figures prepared by the Federal Deposit Insurance Corporation, the total shortage occasioned by Mrs. Geiger's operations in this small bank over this lengthy period exceeded the almost unbelievable amount of $2,175,000.

From September 1947 until June 1961 Mr. Geiger had a hardware and seed business in Sheldon. His wife, however, had full charge of the financial aspects

---

1. The Commissioner has conceded that the Geigers are not liable for fraud additions he originally proposed under § 6653(b) of the Internal Revenue Code of 1954, 26 U.S.C. § 6653(b).

of this business and he relied on her for information as to its profits.

Mrs. Geiger prepared the joint federal income tax returns for 1954–1959, inclusive, for herself and her husband. In those returns she knowingly overstated the seed company's sales in varying amounts less than $20,000 per year. Apart from this purposeful overstatement, no part of the funds she diverted from the bank was reported or mentioned in the Geigers' returns.

On January 16, 1961, examiners found that the bank's books did not balance. They asked Mrs. Geiger to look for the shortage. She informed them that this would be of no use and she then revealed what she had done. The FDIC forthwith took over the bank for liquidation.

Two weeks later an information was returned against Mrs. Geiger. This charged her, in three counts, with embezzlement of bank funds in 1960, in violation of 18 U.S.C. § 656; in eight counts, with causing false entries to be made in the bank's records at various times in 1957 to 1960, inclusive, in violation of 18 U.S.C. § 1005; and, in 24 counts, with willfully misapplying funds of the bank in 1960 and 1961 by honoring checks drawn by persons with insufficient or no funds, in violation of 18 U.S.C. § 656. She pleaded guilty to all 35 counts. Consecutive sentences of five years each on the three embezzlement counts and concurrent sentences of five years on each of the other 32 counts were imposed. She is now in prison.

Mrs. Geiger had no prior criminal record.

The issues here are (A) whether funds embezzled in 1954–1959, inclusive, constitute taxable income to the embezzler under § 61(a) of the 1954 Code, 26 U.S.C. § 61(a);[2] (B) if so, whether the Tax Court correctly determined the amount of such income for the years in question; and (C) whether the period of limitations applicable to the Geigers' returns for 1954–1956, inclusive, is the usual three years prescribed by § 6501(a), or is the six years specified by § 6501(e) (1) (A) for a situation where more than 25% of gross income is omitted. The resolution of the last issue obviously turns on the answers to the first two.

A. *Embezzled funds.* On this issue the following chronology is significant:

1. In February 1946 Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, was decided.

2. In March 1952 Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, was decided.

3. In 1954–1959, inclusive, those portions of Mrs. Geiger's embezzlements which now concern us were effected.

4. In May 1961 James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246, was decided.

Our task is to ascertain, from these three cases, the attitude and teaching of the Supreme Court, as presently constituted, as to the taxability of funds embezzled subsequent to Rutkin but prior to James.

It is of interest to note initially that the Income Tax Act of 1913, § II, subd. B, 38 Stat. 167, provided "That, subject only to such exemptions and deductions as are hereinafter allowed, the net income of a taxable person shall include gains, profits, and income derived from * * the transaction of any lawful business carried on for gain or profit", and that the Revenue Act of 1916, § 2(a), 39 Stat. 757, reenacted this language except that it omitted the word "lawful". That statutory omission has continued to the present day. The omission would seem to imply a congressional intent to tax income unlawfully gained, as well as that honestly received and, indeed, the Supreme Court has so recognized. James v. United States, supra, p. 218 of 366 U.S., 81 S.Ct. 1052. This determination, however, does not resolve the basic question

2. § 61. Gross income defined
   (a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived * * *.

whether a particular illegal receipt is "income" within the meaning and grasp of an income tax statute's catch-all section. That is our present problem.

In Commissioner of Internal Revenue v. Wilcox, supra, 327 U.S. 404, 66 S.Ct. 546 (1946), the Court for the first time was confronted with the question whether embezzled money constitutes taxable income to the embezzler.[3] The pertinent statute was § 22(a) of the 1939 Code. The tax year was 1941. Wilcox was a bookkeeper who had diverted collections belonging to his employer and lost most of them in gambling. The Supreme Court, by a 7 to 1 vote, with the majority opinion by Mr. Justice Murphy, held that embezzled funds were not income. It observed, pp. 407–408 of 327 U.S., 66 S.Ct. p. 549, that "mere dominion over money or property" is not decisive and that "no single, conclusive criterion has yet been found to determine in all situations what is a sufficient gain to support the imposition of an income tax. * * * For present purposes, however, it is enough to note that a taxable gain is conditioned upon (1) the presence of a claim of right to the alleged gain and (2) the absence of a definite, unconditional obligation to repay or return. * * * Moral turpitude is not a touchstone of taxability." Mr. Justice Burton alone dissented. He found no "adequate basis for reading into the broad sweep of the [statute's] language the unexpressed limitation proposed in the majority opinion." He noted that the embezzler's complete possession of the funds and his use of them made them "of obvious economic value to" him; that the majority was reading into the statute an unjustified and sharp distinction between the embezzler and the defrauder; and that there was nothing in the Code which required an absence of an obligation to repay. Pp. 412–415 of 327

U.S., 66 S.Ct. p. 551. See also United States v. Lewis, 340 U.S. 590, 591–592, 71 S.Ct. 522, 95 L.Ed. 560 (1951).

In Rutkin v. United States, supra, 343 U.S. 130, 72 S.Ct. 571 (1952), the issue was the taxability of money obtained by extortion in 1943. This was a criminal case centering in willful evasion and § 145(b) of the 1939 Code but its resolution depended upon whether extortion money qualified as income under § 22 (a). The Court, by a 5 to 4 vote, with the majority opinion written by Mr. Justice Burton, the sole dissenter in Wilcox, held that extorted funds were taxable income. It was observed that Rutkins' "control over the cash so received was such that, in the absence of * * * unlikely repudiation * * * petitioner could enjoy its use as fully as though his title to it were unassailable" and that an unlawful gain was taxable "when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it". Pp. 136–137 of 343 U.S., 72 S.Ct. p. 575. The reconcilability of Rutkin with Wilcox was treated cursorily with the simple comment, p. 138, 72 S.Ct. p. 576, "We do not reach in this case the factual situation involved in Commissioner of Internal Revenue v. Wilcox * * *. We limit that case to its facts". Mr. Justice Black wrote the dissent. He and the three Justices who joined with him were the only ones remaining on the Court who had participated in the majority opinion in Wilcox six years before. The dissenters observed, pp. 139–140, 72 S.Ct. p. 576, that the extortionist was in no different a situation than the embezzler; that he is under a continuing obligation to return the funds; that the majority was adopting the reasoning of the dissent in Wilcox; and that this was largely "a consequence of a change in the Court's personnel." [4]

---

3. The lower federal courts had been in conflict. This circuit was among those which had held that embezzled funds were taxable. Kurrle v. Helvering, 126 F.2d 723 (8 Cir. 1942).

4. The existence on the books of both Wilcox and Rutkin, without the overruling of the former by the latter, forced the lower federal courts then to engage in nimble and close distinctions or to accept different results for embezzlement on the

James v. United States, supra, 366 U.S. 213, 81 S.Ct. 1052 (1961), like Rutkin, was a criminal case and concerned embezzlement during 1951–54, inclusive, and an alleged willful attempt to evade tax by failing to report the embezzled funds. Five separate opinions were written. None of these commanded a majority. The Court, by a 6 to 3 vote, remanded the case with directions to dismiss, but by a like 6 to 3 vote (half of this majority were the dissenters as to the dismissal) overruled Wilcox v. Commissioner of Internal Revenue. Mr. Chief Justice Warren, joined by Justices Brennan and Stewart, observed that "Wilcox was thoroughly devitalized" by Rutkin; that both the extortionist and the embezzler obtain money by a criminal act, have no bona fide claim to it, and possess an obligation to repay; that Congress' purpose was to use the full measure of its taxing power; that Wilcox was wrongly decided; and that, p. 221, 81 S.Ct. p. 1056,

"we should now correct the error and the confusion resulting from it, certainly if we do so in a manner that will not prejudice those who might have relied on it. * * * We should not continue to confound confusion, particularly when the result would be to perpetuate the injustice of relieving embezzlers of the duty of paying income taxes on the money they enrich themselves with through theft while honest people pay their taxes on every conceivable type of income."

These three Justices, however, felt that the essential element of James' willfulness could not be proved "so long as the statute contained the gloss placed upon it by Wilcox at the time the alleged crime was committed". Mr. Justice Clark separately concurred, p. 241, 81 S.Ct. p. 1052, in the overruling of Wilcox but would have affirmed the conviction, either because Wilcox had been overruled in the interim or because the proof showed conclusively that the defendant James placed no bona fide reliance on Wilcox. Mr. Justice Harlan, joined by Mr. Justice Frankfurter, concurred, pp. 241–248, 81 S.Ct. 1052, in the overruling of Wilcox but, rather than reverse outright, would have remanded the case for trial on the issue of James' reliance on the Wilcox doctrine. Mr. Justice Black, with Mr. Justice Douglas joining him, pp. 222–241, 81 S.Ct. 1052, dissented from the overruling of Wilcox. They noted that not only was the criminal aspect of prior embezzlements left in confusion by the James decision but, p. 224, 81 S.Ct. p. 1058, "The question of the civil tax liability of past embezzlers is left equally unclear." Mr. Justice Whittaker, joined by Justices Black and Douglas, pp. 248–258, 81 S.Ct. 1052, 1058, gave emphasis to the Sixteenth Amendment in concluding that embezzled funds were not income, felt that Wilcox was rightly decided, and concurred in the reversal.

This case history and these several approaches in James provide the framework within which the first issue in the present case must be resolved. We note at this point that Justices Frankfurter and Whittaker, who sat on James, are no longer on the Court and that their seats are now occupied by Justices White and Fortas. The other seven Justices who spoke in James remain with us.[5]

one hand and extortion on the other. See J. J. Dix, Inc. v. Commissioner of Internal Revenue, 223 F.2d 436 (2 Cir. 1955), cert. denied 350 U.S. 894, 76 S.Ct. 150, 100 L.Ed. 786. This court did not escape the difficulty. In Marienfeld v. United States, 214 F.2d 632, 637 (8 Cir. 1954), cert. denied 348 U.S. 865, 75 S.Ct. 87, 99 L.Ed. 681, the majority, obviously with some pain, drew the line between the defendant's possession of an immediate or a deferred obligation to account for the funds.

Judge Johnsen, in separately concurring, pp. 639–640, would not rest his decision on any such "narrow line of demarcation" but would predicate it "upon the simple and solid basis under the statute of actual economic gain, value and enjoyment having existed to the criminal". He felt that Kurrle v. Helvering, supra, was sound.

5. One might question, perhaps, whether all the acts of Mrs. Geiger constituted embezzlement, in the strict sense, see Moore v. United States, 160 U.S. 268, 269, 16 S.

It seems certain to us, from the holding in Rutkin and from the language of the several opinions in James and the implications which flow therefrom, that a majority of the Supreme Court, as presently constituted, would hold that funds embezzled in the calendar years 1954–59 constitute taxable income to the embezzler for civil nonfraud deficiency purposes where reliance on Wilcox is not a factor. Clearly, Mr. Justice Clark would so hold, for he was among the majority in Rutkin and would have affirmed the conviction of James. Clearly, Mr. Justice Harlan would so hold, for he would have affirmed the conviction of James in the absence of reliance on Wilcox, and went so far as to observe, p. 244 of 366 U.S., p. 1069 of 81 S.Ct., "I take it that our decisions in the tax and any other field for that matter *relate back*

to the actual transactions with which they are concerned." And it seems clear, too, that the Chief Justice and Justices Brennan and Stewart, who joined him in James, should so hold, for their emphasis, p. 220, 81 S.Ct. p. 1056, was on "re-examining and correcting the Court's own errors", despite congressional inaction during the interim since Wilcox. Their concern was the avoidance of possible prejudice to "those who might have relied on" Wilcox; that concern found expression with respect to the willfulness factor of the crime with which James was charged. But willfulness and prejudice are not factors on the civil side of tax liability (at least in the context of embezzled funds) apart, of course, from any fraud penalty which is not now in the present case.[6] Perhaps Justices Black and Douglas, because of their con-

Ct. 294, 40 L.Ed. 422 (1895); Groves v. United States, 343 F.2d 850, 854 (8 Cir. 1965), rather than some other variety of misappropriation. To the extent, if any, that we possibly are concerned here with non-embezzlement misappropriations, the issue of the retrospective effect of James in this civil deficiency suit is probably avoidable. This is so because Wilcox was regarded as a narrow exception to the general rule that unlawful gains, as well as lawful ones, are taxable. Cohen v. United States, 297 F.2d 760, 769, (9 Cir. 1962), cert. denied 369 U.S. 865, 82 S.Ct. 1029, 8 L.Ed.2d 84; Rutkin v. United States, supra, pp. 136–138 of 343 U.S., 72 S.Ct. 571; James v. United States, supra, pp. 218–219 of 366 U.S., 81 S.Ct. 1052. Accordingly, many courts have taken pains to inquire into the nature of the particular misappropriations and have reached conclusions that something other than embezzlement was present. The Wilcox-James problem, in one context or another, thus has been side-stepped. See, for example, United States v. Jannsen, 339 F.2d 916, 918–919 (7 Cir. 1964); United States v. Goldberg, 330 F.2d 30, 38–40 (3 Cir. 1964), cert. denied 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497; Federbush v. Commissioner of Internal Revenue, 325 F.2d 1 (2 Cir. 1963). Compare United States v. Pitoscia, 238 F.Supp. 135 (D.N.J.1965).

We do not indulge in any such analysis and identification of the misappropriations in the present case. We are content, instead, to give the Geigers the "benefit" of any doubt and to make the assumption

that her defalcations were embezzlements. We do so for three reasons: First, Mrs. Geiger's plea of guilty, so far as the first three counts of the information are concerned, was to specific charges of embezzlement, albeit in 1960. Second, the Commissioner in his Tax Court answer alleged fraud and stated, among other things, "During the period of her employment by the Sheldon National Bank, petitioner Burnice I. Geiger embezzled for her own use funds belonging to said bank in the amount of at least $2,174,799.90". The Geigers, by their reply, admitted that Mrs. Geiger, during the period of her employment by the bank, "embezzled for her own use funds belonging to said bank". Third, the Commissioner has not suggested to us that the 1954–59 misappropriations were not embezzlements.

6. Mrs. Geiger in her deposition said that she had "read that embezzled funds were not taxable in any way. In fact, "I have heard several lawyers say that they were not taxable". It is not contended, however, that she would not have embezzled had she thought the proceeds were taxable. The only argument seemingly available to her, based upon prejudicial reliance —and it is not one advanced to us—would be that, in such reliance as to then existing law, she had disposed of the bulk of her proceeds without setting aside a reserve to pay taxes. This kind of thing, however, has not prevented retrospective application of changed interpretations in the civil aspects of tax law. See, for example, Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940).

tinued adherence to Wilcox, would vote otherwise unless they were to conclude that, although in disagreement, they were bound by the recent precedent of James. But this is not certain, for their opinion, p. 225, 81 S.Ct. p. 1058, refers to "the fact that [the Court's] judgments could not be limited to prospective application." Naturally we cannot speculate as to the attitude of Justices White and Fortas for neither participated in James.

The Geigers argue that James, in deciding that embezzled funds are income, was intended to be only prospectively applied; that it thus does not govern their tax years 1954–59, when Wilcox was still the stated law; and that a contrary holding is inequitable because embezzlers of 1953 and prior years were not taxed on their embezzlements. They rest this argument on the use in the Chief Justice's opinion, p. 221, 81 S.Ct. p. 1056, quoted above, of words of present correction ("we should *now* correct"; "We should not *continue* to confound * * * when the result would be to *perpetuate*" [emphasis supplied by the Geigers]), and on comments in the Black-Douglas opinion, pp. 223–224, and 230, 81 S.Ct. p. 1061 ("dissent * * * from the *prospective* way" in which the overruling of Wilcox is done; "*it will be the law tomorrow*"; and "*Were it not for the novel formula of applying the Court's new law prospectively*" [emphasis similarly supplied]).

We are not persuaded by this argument. We repeat our observation that the Chief Justice's opinion is directed to the correction of "the Court's own errors". It is true that he and those joining with him concluded that, in view of the presence of Wilcox since 1946, no past willfulness in evasion could be proved against James and thus the James decision in their minds, as a matter of practicality, could be only prospective in application to a crime of tax evasion of which willfulness is a part. This, however, does not prevent the application of James to a situation where willfulness is not a factor. The civil non-

fraud tax liability of the Geigers is such a situation. We also read the comments of Mr. Justice Black, not in terms of restricted, prospective application of James, but in terms of criticism of results flowing from the Wilcox-Rutkin-James chronology. Here, too, his targets are the willfulness feature of the crime of evasion and the Chief Justice's conclusion that it can be only prospectively applied.

■ Our duty is to follow the Supreme Court decisions and their implications as we see them. In view of the analysis we have made, we must hold that funds embezzled in the calendar years 1954–59, inclusive, are income to the embezzler. We thus decide the first issue against the Geigers. We add, for what it might be worth, that, were this a matter of first impression for the present panel, we, too, would reach this conclusion independently, for we are in agreement with the 1942 decision of this court in Kurrle v. Helvering, 8 Cir., 126 F.2d 723, and with the reasoning of Judge Johnsen, concurring, in Marienfeld v. United States, 214 F.2d 632, 639–640 (8 Cir. 1954), cert. denied 348 U.S. 865, 75 S.Ct. 87, 99 L.Ed. 681.

As an addendum we observe that those cases since James which appear to have to do with embezzlement and which concern either expressly or, by necessary implication, the retrospective effect of James in a civil deficiency suit all support the Commissioner's position on this appeal. The only decisions we have found which squarely hold that James applies to antecedent embezzlement are Marvin E. Nerem, 41 T.C. 338 (1963), petition for review by Eighth Circuit dismissed for want of jurisdiction; William G. Hackney, T.C. Memo 1965–127; and Newell W. Emerson, T.C. Memo 1965–185. Like results, however, have been reached without specific discussion of the retrospective feature in Estate of Adame v. Commissioner of Internal Revenue, 320 F.2d 811, 814 (5 Cir. 1963) (as to the 1953 deficiency there at issue); Stoller v. United States, 320 F.2d 340, 344 (Ct.Cl.1963); and L. M. Mul-

drow, 38 T.C. 907, 912 (1962). See Leaf v. Commissioner of Internal Revenue, 295 F.2d 503 (6 Cir. 1961), affirming 33 T.C. 1093. Dicta to the same effect are present in Sowell v. Commissioner of Internal Revenue, 302 F.2d 177, 181 (5 Cir. 1962); Donohue v. Commissioner of Internal Revenue, 323 F.2d 651, 652 (7 Cir. 1963), cert. denied 376 U.S. 911, 84 S.Ct. 667, 11 L.Ed.2d 609; and United States v. Goldberg, 330 F.2d 30, 39 (3 Cir. 1964), cert. denied 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497.

B. *The omitted income computations.* Except for minor adjustments not here in issue, the deficiencies initially proposed by the Commissioner in the Geigers' federal income taxes for 1954–59, inclusive, were attributed to his allocating an even $1,000,000 of the entire bank shortage of approximately $2,175,000 to the eight years from 1952–59, inclusive; his spreading this million evenly over those eight years; his consequent assignment of $125,000 as income to each of the six taxable years 1954–59 which he felt were then still open; and his allocating the entire remainder of the bank's shortage to 1960 and 1961. During the trial, however, the Commissioner, deferring to computations prepared by the FDIC, conceded that the includible amounts, after credit for the sales overstatements for Mr. Geiger's business, did not exceed specified lesser figures. The reduced amount of omitted income for each year was based upon (a) FDIC identified shortages for the year, and (b) a one-thirtieth share of an aggregate of unidentified shortages for the entire 30 year period. These unidentified items totaled $464,874.91; each year's share was therefore computed at $15,495.

The FDIC computations were in the form of exhibits placed in evidence by stipulation. The Tax Court, because the parties did not expressly stipulate that these exhibits correctly reflected the fact situation, and because it felt that that situation was not otherwise established by evidence, stated that the exhibits "do not constitute proof of the correctness of the items", and that they "are without probative effect as to the actual amount of the shortage in the funds of Sheldon Bank or as to the years and parties to whom the shortage, whatever may have been the correct amount thereof, was properly allocable". (Both parties here disagree with this statement; however, the taxpayers, it seems to us, attack the statement for certain purposes and accept it for others). Judge Withey concluded that he was unable, in any event, to find that the taxpayers had established that their own proposed alternative lower figures were proper and to be employed. He held that the Commissioner's initial determination was presumed to be correct, that the burden was on the taxpayers to show that it was not, that this burden had not been discharged, and that the Commissioner's concession as to reduced amounts, however, was to be given effect in a recomputation of deficiencies. The Court's ensuing decision was computed accordingly.

The taxpayers attack the omitted income figures (that is, both the $1,000,000 and the $464,874.91 unallocated shortage) in what are, essentially, three respects. It is asserted that these figures are erroneous because they fail to adjust for the following:

1. A bank shortage of $75,000 already in existence when Mrs. Geiger began her employment in 1921. The only evidence as to such a shortage at that time consists of Mrs. Geiger's own statement made by deposition and in general terms. The taxpayers also emphasize the fact that the United States attorney, at the imposition of sentence in the criminal proceeding, stated that Mrs. Geiger "discovered that the bank records were being manipulated to conceal a shortage of approximately $75,000 which then existed".

We are not inclined, first of all, to draw any estoppel against the Commissioner in the United States attorney's reference. This was a mere recognition of Mrs. Geiger's position and seems to be nothing more than a kind

attempt, at the time of the sentencing, to suggest a background reason for her later misappropriations. See, generally, as to estoppel against tax authorities, 10 Mertens, Law of Federal Income Taxation, §§ 60.14–.15. Furthermore, the taxpayers made no move otherwise to prove the existence of a preexisting shortage, or that it was on the books of the bank when the FDIC made its examination, or that it continued to exist throughout the entire 30 year period. The Tax Court was not required to accept Mrs. Geiger's bare statement. Kann v. Commissioner of Internal Revenue, 210 F.2d 247, 250–51 (3 Cir. 1953), cert. denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1109; Rand v. Helvering, 77 F.2d 450, 451 (8 Cir. 1935); Banks v. Commissioner of Internal Revenue, 322 F.2d 530, 537 (8 Cir. 1963). Finally, we feel that the FDIC exhibits did have some probative value and that Judge Withey's characterization of them as "without probative effect" was directed only to their worth in fixing actual and specific amounts of shortage. The exhibits, in fact, were admitted into evidence.

■ 2. Mrs. Geiger's loss of an average of $1,000 per month for 30 years, a total of $360,000, on the Board of Trade. The Tax Court found that Mrs. Geiger, during the period of her employment by the bank, "appropriated and converted to her use in transactions on the Board of Trade an average of approximately $1,000 a month of the bank's money". It is to be observed that the Tax Court did not find that the $1,000 per month was lost. It found only that Mrs. Geiger appropriated that amount for use in Board transactions. This, it seems to us, is fatal to the taxpayers' argument. Use does not equate with loss.

■■ Here again the only evidence that these amounts were lost was Mrs. Geiger's own generalized statement to this effect. We have noted above that the Tax Court was not required to accept her testimony. No Board records were produced to establish the taxpayers' contentions. No losses of this kind were reported in their returns as filed although the returns for 1954, 1957 and 1959 did reflect capital transactions. Finally, the taxpayers' suggestion that, because of these losses, $12,000 is deductible annually, under § 165(c) (1) or (2), in the computation of net income, a contention raised for the first time on appeal, overlooks the fact that any loss of this kind would qualify as one sustained on disposition of a capital asset, under §§ 1221 and 165(f) of the 1954 Code, Commissioner of Internal Revenue v. Covington, 120 F.2d 768, 770 (5 Cir. 1941), cert. denied 315 U.S. 822, 62 S.Ct. 912, 86 L.Ed. 1219; Estate of Smith v. Commissioner of Internal Revenue, 313 F.2d 724, 736 (8 Cir. 1963); 3B Mertens, Law of Federal Income Taxation, § 22.14, p. 72, and would be limited to the extent allowed by §§ 1211 and 1212. These limitations would reduce any deduction otherwise available to a small amount compared with the asserted claim for $12,000 annually.

3. Amounts which the taxpayers claim cannot properly be regarded as income to Mrs. Geiger. These are:

a. The sum of $7,542.77 which remained in Mrs. Geiger's personal accounts with the bank on January 16, 1961.

b. The sum of $29,592.26 which remained in the bank in accounts for Mr. Geiger and his business on January 16, 1961.

c. Improper credits to the accounts of depositors, other than the Geigers and the business, which exceeded any repayments to Mrs. Geiger.

d. Checks drawn by such persons and withheld by Mrs. Geiger from charging and cancellation.

The effect of this would be that only the following shortage items are includable in Mrs. Geiger's income:

a. Checks drawn by Mrs. Geiger on her personal checking account and withheld from charging and cancellation.

b. Improper credits to her accounts to the extent that, in the aggregate, they exceed the balances in those accounts on January 16, 1961.

c. Checks drawn on the business account the proceeds of which went for the personal use and benefit of Mrs. Geiger, less replacement deposits made in that account.

d. Amounts returned to Mrs. Geiger by beneficiaries of improper credits.

It seems to us that the taxpayers' argument that the first group of items above described cannot properly be regarded as income to Mrs. Geiger raises two questions: (a) Did her improper and purposeful crediting of a Geiger account effect, in and of itself, the realization of income taxable to her? (b) Did her improper and purposeful honoring of a check or crediting of a bank account of another result in income to her?

The taxpayers contend that Mrs. Geiger's crediting of an account "did not change the amounts of money, funds or credits owned by the bank"; that at that point she did not take anything of value belonging to the bank; and that the bank's funds were involved only when the check was presented for payment and was honored and paid.

■ We nevertheless answer the first question adversely to the taxpayers. Income, for a cash basis taxpayer, is not restricted to cold cash in a taxpayer's fist. Income may be constructively received. Helvering v. Horst, 311 U.S. 112, 115, 61 S.Ct. 144, 85 L.Ed. 75 (1940). It has long been recognized, for example, that the crediting of interest to one's savings account, or the maturing of a bond coupon without, in the one case, withdrawal or, in the other, deposit or cashing, is income. 2 Mertens, Law of Federal Income Taxation, § 10.12, pp. 37, 39; Treas.Reg. § 1.451–2(a) and (b), including the amendment effected by T.D. 6723, 1964–1 C.B. 73. Although these examples are not precise parallels, it follows, we think, that, as to the improper credits Mrs. Geiger effected for her own accounts, income was forthwith realized, despite the fact that there was no immediate withdrawal or that there were balances remaining when her defalcations were uncovered in 1961. The key fact is control or, as we have noted above as to the embezzlement issue, readily realizable economic benefit derived therefrom as a practical matter. Rutkin v. United States, supra, p. 137 of 343 U.S., 72 S.Ct. p. 571, 96 L.Ed. 833. That the funds happened to remain for the time being in the bank as such is not material.

■ This approach answers the argument that the 1961 balances in the several Geiger accounts are to be used in reduction of taxable income. Their absorption in 1961, when the bank was taken over, might well qualify them as deductions for that year, James v. United States, supra, p. 220 of 366 U.S., 81 S.Ct. 1052, 6 L.Ed.2d 246; and see § 1341 of the 1954 Code; but this fact does not disturb the income character of the improper credits at the time they were effected. James v. United States, supra, pp. 219–220 of 366 U.S., 81 S.Ct. 1052; Rutkin v. United States, supra, p. 137 of 343 U.S., 72 S.Ct. 571; Dawkins v. Commissioner of Internal Revenue, 238 F.2d 174, 179 (8 Cir. 1956).

■ In turning to the second question, involving, in the aggregate, sums less than those diverted to Geiger accounts, we find nothing persuasive in the fact that other persons were the recipients of the "loans and gifts". The taxpayers' position in effect is that, technically, these funds flowed direct from the bank to the outside beneficiaries and did not pass through Geiger hands. That may be one way to describe it. Another, equally valid, is that the funds came to Mrs. Geiger and were passed out or made available by her to the beneficiaries. These beneficiaries were the objects of her bounty, not the bank's. She was the force and the fulcrum which made those benefits possible. She assumed unto herself actual command over the funds. This is enough. Corliss v. Bowers, 281 U.S. 376, 378, 50

232

S.Ct. 336, 74 L.Ed. 916 (1930). We are not sympathetic with the claim that, because she may not have used the funds for personal needs, she is not to be taxed. She enjoyed benefits of a kind which obviously must have loomed large in her mind and have been important to her— status as the beneficent donor to good causes and favored acquaintances, a reputation as an available friend in need, the acquisition, with respect to a "loan", of the resulting obligation to her, and the like. Helvering v. Horst, supra, pp. 116–117 of 311 U.S., 61 S.Ct. 144. It would be ironical to hold otherwise.

■ Of no legal significance in the Geigers' tax picture is the fact that the bank possessed a right to recover from beneficiaries the improper credits or payments made for or to them. This same feature characterizes other misapropriations and illegal gains and does not disqualify them as taxable income. Rutkin v. United States, supra, p. 137 of 343 U. S., 72 S.Ct. 571; James v. United States, supra, p. 216 of 366 U.S., 81 S.Ct. 1052.

We therefore decide all aspects of this computational issue against the taxpayers.

■ C. *The years 1954–56 and the limitations period.* Section 6501(e) (1) (A) is not a penalty statute. It stands in contrast, for example, to § 6653 which imposes penalties for underpayment due to negligence, and for fraud. Section 6501(e) (1) (A) merely provides a longer period in which a deficiency assessment may be made whenever there is an omission of more than 25% of gross income stated in the return. Such is the situation here for the Geigers' taxable years 1954–56, inclusive. Those years thus remained open and deficiencies, when assessed in early April 1961, were not barred. It provides small comfort to the taxpayers, of course, but one may note that deficiencies due to like misappropriations in the years prior to 1954 are in fact barred.

We find no error in the deficiencies as determined by the Tax Court.

Affirmed.