MELVIN PIERSON and MARJORIE M. PIERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pierson v. Commissioner
Docket No. 8030-73.
United States Tax Court
T.C. Memo 1976-281; 1976 Tax Ct. Memo LEXIS 124; 35 T.C.M. (CCH) 1256; T.C.M. (RIA) 760281; September 2, 1976, Filed Thomas D. Roberts and Martin S. Wohl, for the petitioners. Richard H. Gannon, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1964 and 1965 in the amounts of $8,110.21 and $14,140.20, respectively. In addition, the Commissioner asserted negligence penalties pursuant to the provisions of section 6653(a), [1] Internal Revenue Code of 1954, in the amounts of $405.51 and $707.01. *125 The sole issue presented for decision is whether certain amounts received by Petitioner Melvin Pierson during the taxable years in question are includable in petitioners' income. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners Melvin and Marjorie M. Pierson, husband and wife, resided in San Diego, California, at the time of filing their petition. Joint Federal income tax returns for the taxable years 1964 and 1965 were filed by petitioners with the Internal Revenue Service Center, Ogden, Utah.Marjorie M. Pierson is a party by virtue of having filed a joint return with her husband during the taxable years in question. Therefore, Melvin Pierson will hereinafter be referred to as petitioner. During the taxable years 1964 and 1965, petitioner owned and operated a recreation center in Los Angeles, California. In 1961, Sam Yorty was elected mayor of Los Angeles and served in that capacity until 1973. Throughout this period, Mayor Yorty was involved in several campaigns for higher political office. More specifically, Mr. Yorty ran for governor of California in 1962 *126 and 1966, the United States Senate in 1964 and for President of the United States in 1968. Petitioner was appointed by Mr. Yorty as one of five members of the Recreation and Parks Commission.As a commissioner, petitioner participated in policy making decisions as respects the Recreation and Parks Commission. Remuneration was, however, limited to $10 per meeting or $50 per month. Joseph H. Quinn was appointed deputy mayor in charge of policy and Eleanor Chambers was appointed deputy mayor in charge of administration. Mrs. Chambers also directed the collection and accounting of campaign contributions pledged by or through the city commissioners appointed by Mayor Yorty. It was, moreover, Mrs. Chambers' view that friends of the administration were to be rewarded; thus, city contracts were in large measure awarded those most willing to make substantial contributions to Mr. Yorty's various campaigns.These contributions were often directed to Mrs. Chambers. Mayor Yorty's administration actively encouraged the solicitation of campaign contributions by the city commissioners. Petitioner, considering himself a member of the Yorty administration, became actively involved in political *127 fundraising activities soon after his appointment to the Recreation and Parks Commission. Petitioner's solicitation activities took two basic forms -- the sale of tables and the like at political fund raisers and the solicitation of direct cash contributions. Petitioner eventually collected approximately $500,000 for the mayor's campaigns. Petitioner's efforts were, on occasion, exemplified by Mrs. Chambers. Other city commissioners participated in fund raising to varying degrees.The funds solicitated by the commissioners were remitted to Mrs. Chambers who would berify and acknowledge the amount.This procedure insured that amounts collected were actually turned over to the administration. By directive issued July 24, 1961, styled "Executive Directive No. 3," Mayor Yorty required all important prospective city contract and lease agreements to be submitted to the mayor's office for approval. Mrs. Chambers thus had access to all such agreements. Pressure was applied by the Yorty administration to secure a political contribution in return for favorable action on city contracts; moreover, it was the practice to channel city business in the direction of those most willing to make *128 such payment. Petitioner assumed an unofficial role on behalf of Mrs. Chambers by acting as liaison for communications between her office and the other city commissioners regarding election fundraising matters. In this capacity, city, petitioner was in daily contact with Ms. Chambers. In early 1962, petitioner met Irving D. Shapiro, an architect and urban land economist, now unemployed. At that time, Mr. Shapiro was interested in obtaining work from the city of Los Angeles. Mr. Shapiro was introduced to petitioner by Mr. Sherwin Memel who thought petitioner could aid Mr. Shapiro in his quest for city business. Petitioner suggested that Mr. Shapiro become visually expose to people in government by making political contributions. From time to time thereafter, Mr. Shapiro made contributions to various candidates for public office. Mr. Shapiro advised petitioner that the Harbor Department was considering the erection of a building in the San Pedro area and that he was interested in securing the contract. Mr. Shapiro felt the project could serve as a showcase for his talent and would be an important first step in securing city business. Petitioner advised Mr. Shapiro to *129 correspond with the manager of the Harbor Department and that it would be wise to contribute to the current Yorty campaign.Petitioner told Mrs. Chambers of Mr. Shapiro's desire and was led to believe by her that the contract would be awarded the architect willing to contribute the most to the Yorty campaign. Petitioner thus advised Mr. Shapiro that the job was available but "it would cost money." He further informed Mr. Shapiro that if he were unwilling to pay, the contract would be awarded to another architect. Mr. Shapiro agreed to rebate between six and ten percent of the architect fee less an offset for taxes paid on that amount, or one percent of the total cost of the building less an offset for taxes. Petitioner told Mrs. Chambers of the agreement and the contract was awarded to Mr. Shapiro in mid-1963. Mr. Shapiro completed the architectural work in mid-1964; however, the project was abandoned. The following amounts were remitted to petitioner by Mr. Shapiro: Date
Amount
7/15/63
$ 4,000
7/26/63
200
7/29/63
5,500
9/11/63
2,304
2/10/64
8,000
8/5 /64
2,850
TOTAL
$22,854 In 1964, a total of $10,850 was paid to petitioner by Mr. Shapiro in connection *130 with the Harbor contract. The payments were made in cash at Mr. Shapiro's office. The sums were placed in a white envelope and handed over to petitioner who then delivered the amounts to Mrs. Chambers. Upon receipt, she would place the contents in the drawer of her desk at city hall. Petitioner was unaware of the amounts of the payments. Either Mrs. Chambers of Mr. Shapiro would contact petitioner to initiate a transfer of funds. Petitioner had no official concern with matters within the jurisdiction of the Harbor Commission. Moreover, petitioner had no particular personal influence. The approval of increases, extentions and revisions in Mr. Shapiro's Harbor contract came from pressure exerted on his behalf by Mrs. Chambers. The Los Angeles Parks and Recreation Commission initiated a feasibility study to determine whether certain property, known as Dockweiler Beach, was suited for an overnight camping area and trailer park. A contract was awarded to Mr. Shapiro on February 28, 1963, to make this determination. Mr. Shapiro received total compensation of $15,000 of which $1,500 was transferred to petitioner. This sum was then delivered by petitioner to Mrs. Chambers. *131 The Parks and Recreation Commission proposed a study to determine the feasibility of upgrading and redeveloping a minor league baseball park known as Wrigley Field. Pursuant to Directive No. 3, the proposal was submitted to the mayor's office for approval. On July 15, 1965, a contract to make the study was awarded to Mr. Shapiro. In return, Mr. Shapiro agreed to make a payment. He paid $3,000 to petitioner who in turn delivered the payment to Mrs. Chambers. Petitioner was convicted under California Penal Code section 68[2] for receiving this payment. *132 In 1964, Mr. Shapiro was retained by Mr. Wallace White, a Los Angeles land developer and builder, to perform architectural services in connection with a parcel of property, known as Canoga Park, which was owned by Mr. White and others. To effect the desired plan of development, it was necessary to rezone seven acres of the parcel. Favorable action was taken by the City Planning Commission and the City Council. However, the proposed change was vetoed by the mayor. Mr. Shapiro then met with petitioner to determine whether the veto could be withdrawn. Petitioner was unsure, but he expressed the feeling that Mr. White should be willing to make a payment, termed a campaign contribution, in order to reverse the mayor's veto. Petitioner then discussed the matter with Mrs. Chambers. In November 1964, Mr. Shapiro met with Mr. White to discuss the situation. Mr. White agreed to make a payment of $21,000 or $3,000 for each of the seven acres. In early December 1964, Mr. White delivered $21,000 in cash to Mr. Shapiro, who deposited the cash in a safe deposit box. On December 8, 1964, Mr. Shapiro delivered $10,500 to petitioner. Subsequently, the mayor's veto was withdrawn and, on *133 or about December 16, 1964, Mr. Shapiro delivered the final installment of $10,500 to petitioner. The payments received by petitioner were delivered to Mrs. Chambers. Mr. White approached Mr. Shapiro in the summer of 1965 with yet another zoning problem involving the Blakiston Ranch located in the Chatworth area of Los Angeles. The property was owned by a wealthy eastern family, and Mr. White, desirous of developing the property, sought to have it rezoned. Mr. Shapiro contacted petitioner, explained the situation and related that his client would be willing to make a payment in exchange for a zoning change. Petitioner told Shapiro that he felt the change could be made and then informed Mrs. Chambers. Mr. Shapiro informed petitioner that his principals would be willing to pay $40,000; this amount was acceptable to Mrs. Chambers. After the parcel was rezoned, Mr. White delivered the $40,000 or $4,000 for each of the 10 acres, to Mr. Shapiro who placed the money in a black folio and delivered the case to petitioner who thereupon delivered the amount to Mrs. Chambers. This transaction occurred during a period of intense fundraising activity. Petitioner had no responsibility *134 for zoning matters in the city of Los Angeles; moreover, he did not possess sufficient personal influence to affect zoning decisions. Mrs. Chambers did, however, possess considerable influence in the Yorty administration and, in addition, had political responsibility for zoning matters. Mr. Shapiro was aware of petitioner's relationship with Mrs. Chambers and the Yorty administration and that petitioner did not possess sufficient power to influence important city decisions. There was, in fact, an expectancy by Mr. Shapiro that the funds given to petitioner would in fact be remitted by petitioner to the Yorty administration. In his statutory notice of deficiency, the Commissioner determined that petitioner received bribery income in the taxable years 1964 and 1965 of $31,850 and $43,000, respectively. The Commissioner further determined that a medical expense deduction taken by petitioner was not allowable in part because of the increase in income for 1965. ULTIMATE FINDING OF FACT Petitioner received $31,850 in 1964 and $43,000 in 1965 from Irving D. Shapiro; the funds so received were promptly delivered to Eleanor Chambers. Petitioner did not exercise dominion and control *135 over the amounts received but rather acted merely as a conduit for the flow of funds from Mr. Shapiro and others to Mrs. Chambers and the Mayor Yorty administration. OPINION The sole question before us is whether certain payments received by petitioner during the taxable years 1964 and 1965 and remitted by him to a member of the Yorty administration should have been included in petitioners' income for those respective years. At the time the statutory notice of deficiency was issued, the 3-year period for assessment for the taxable years 1964 and 1965 had expired.Therefore, pursuant to section 6501(e), respondent must establish that petitioners omitted from gross income, in each of those years, an amount in excess of 25 percent of the amounts reported. Respondent, characterizing the payments as bribes received by petitioner to influence the award of architectural contracts and zoning changes, argues the sums were received under a claim of right. Petitioner counters with the assertion that he acted merely as a conduit for the flow of funds to Mrs. Chambers, that it was she, feeling that friends of the administration were to be rewarded, who influenced the award of city contracts *136 and zoning changes and, therefore, the payments received by him and remitted to Mrs. Chambers did not constitute items of gross income in his hands. We agree with petitioner. It is well settled that a taxpayer who receives an item of income under a claim of right and without restriction as to its disposition must include that item in gross income. North American Oil Consolidated v. Burnet,286 U.S. 417 (1932). It is equally clear that amounts over which the taxpayer acts merely as a conduit are not required to be included in income; we so stated in Sol Diamond,56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974): * * * a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit. * * * Respondent theorizes that because petitioner did not have the power to contractually bind Mrs. Chambers to influence the award of city contracts and zoning changes, and, moreover, because petitioner conducted the negotiations which led to the payments made by Mr. Shapiro, and thereby reaped political benefits, *137 the amounts received by him were received under a claim of right. As authority for his position, respondent cites National Carbide Corp. v. Commissioner,336 U.S. 422 (1949). National Carbide Corp. is inapposite to the facts presented herein. The Court therein was presented with a situation involving a subsidiary corporation allegedly acting as the agent of its parent. The Court found that amounts received by the subsidiary and remitted to its parent were includable in the gross income of the subsidiary, reasoning that the amounts were transferred to the parent as a consequence of the parent's ownership and control of the subsidiary, not pursuant to a purported agency relationship. The Court pointed out that it was not impossible for a subsidiary to act as the agent of its parent, and delineated certain attributes of the law of agency by which to test a putative agency; e.g., whether the subsidiary operates in the name and for the account of the parent, binds the principal, transmits money received to the principal. The Court did not suggest that a taxpayer acting merely as a conduit for the flow of funds to another must in all cases comply with the formal *138 requirements of agency. Simply having conducted negotiations, and perhaps realizing some intangible political benefit is not controlling; rather, the issue must turn on whether petitioner received the amounts under a claim of right. See Allen Schiffman,47 T.C. 537, 541 (1967). In Re Parr,205 F.Supp. 492 (S.D. Tex. 1962), the bankrupt and another individual agreed, in return for a payment of $20,000 that the other individual would not seek reelection. The funds utilized for payment were siphoned from the county road and bridge fund. The facts clearly established that the payment was arranged by the bankrupt. Moreover, a clear political benefit was obtained by the bankrupt. However, the court held that the crucial element -- that of some personal economic gain--was absent. Therefore, because the evidence failed to establish some personal economic benefit, the amounts paid did not constitute income to the bankrupt. Similarly, in Lashells' Estate v. Commissioner,208 F.2d 430 (6th Cir. 1953), the court reasoned that mere receipt and possession were insufficient to occasion taxation, holding statutory gain or profit must result. *139 Further, the court stated that even in the absence of an enforceable obligation to pay over amounts received, the prompt payment thereof negates any claim of right. The evidence herein reveals that Mr. Shapiro intended the payments to influence the award of city contracts and zoning decisions, and that he expected the payments to be remitted to influential members of the Yorty administration. Petitioner promptly delivered all funds which he received to Mrs. Chambers. It cannot be said that petitioner received payments from Mr. Shapiro under a claim of right. [3]Geiger's Estate v. Commissioner,352 F.2d 221 (8th Cir. 1965), affg. a Memorandum Opinion of this Court, is also distinguishable.The taxpayer was a bank employee who embezzled funds for 30 years by crediting the accounts of depositors with amounts to which they were not entitled. The Court of Appeals rejected the taxpayer's argument that the money was not taxable to her because she did not receive it by stating: She enjoyed benefits of a kind which obviously must have loomed large in her mind and have been important to her -- status as the beneficent donor to good causes and favored acquaintances, a *140 reputation as an available friend in need, the acquisition, with respect to a "loan", of the resulting obligation to her, and the like. * * * [352 F.2d at 232.] Although petitioner here enjoyed his role as one of the leading fund raisers for the Yorty campaigns, the benefit to him was merely incidental. Based upon our observation of petitioner and the entire record we believe petitioner raised the funds because he thought it was expected of him and the personal benefit derived from such satisfaction is much too speculative to give rise to taxable income. We do not condone the use of political kickbacks, however styled. Nevertheless, concepts of taxation and local policy do not necessarily form a perfect union. Decision will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. Sec. 68, Cal. Penal Code: Every executive or ministerial officer, employee or appointee of the State of California, county or city therein or political subdivision thereof, who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby, is punishable by imprisonment in the State prison not less than one nor more than fourteen years; and, in addition thereto, forfeits his office, and is forever disqualified from holding any office in this State.↩
3. It is unnecessary to determine whether the payment made to Mrs. Chambers would be deductible to petitioner had he received the sums from Mr. Shapiro under a claim of right.↩