VICTOR J. LOTA and BARBARA R. LOTA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lota v. Commissioner
Docket No. 17835-82.
United States Tax Court
T.C. Memo 1985-270; 1985 Tax Ct. Memo LEXIS 361; 50 T.C.M. (CCH) 55; T.C.M. (RIA) 85270; June 5, 1985. *361 P was a bank loan officer. During the years at issue, he approved a number of loans to various individuals using false loan documentation. P did not have authority from the bank to make such loans. P also received kickbacks from various individuals for whom he had approved loans. Held:
(1) Amount of income to P as a result of his unauthorized disbursal of bank funds determined. (2) Amount of kickback income to P determined. (3) P is liable for an addition to tax for fraud under sec. 6653(b), I.R.C. 1954, for each of the years at issue. R. Travis Douglas, for the petitioners. Deborah *362 R. Jaffe and Kathleen O. Lier, for the respondent. SIMPSON MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Additions to Tax
Sec. 6653(b)
Year
Deficiency
I.R.C. 1954 [1]
Victor J. Lota
1978
$222,776.20
$111,388.10
1979
2,158,899.14
1,079,449.57
Barbara R. Lota
1979
$ 14,941.67
After a concession, the issues for decision are: (1) To what extent did the petitioner realize income during the years at issue as a result of his unauthorized disbursal of bank funds; (2) to what extent did the petitioner realize income during the years at issue as a result of kickbacks received by him; and (3) whether the petitioner is liable for the addition to tax for fraud under section 6653(b) for either of the years at issue. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Victor J. and Barbara *363 R. Lota, husband and wife, resided in New Orleans, La., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1978 and 1979 with the Internal Revenue Service Center, Austin, Tex. Mr. Lota will sometimes be referred to as the petitioner. The petitioner had a bachelor's degree in business administration. He also had a J.D. degree, and during the years at issue, he was admitted to practice law in Louisiana. The petitioner was employed by the Hibernia National Bank (the bank) in New Orleans for approximately 23 years. He became a vice president of the bank in 1968, and during the period from 1968 through February 1980, he was a loan officer. During 1978 and 1979, the petitioner had authority to make unsecured loans of up to $25,000 to bank customers without having the loan reviewed by the bank's loan review committee. In addition, he was authorized to make unsecured loans of from $25,000 to $100,000 with review of the divisional loan review committee; such review took place after the proceeds of the loan had been disbursed. The petitioner was not authorized to make loans in excess of $100,000 without prior review *364 and approval of the proposed loan by the senior loan committee of the bank. The petitioner was also not authorized to make loans to any individual or entity which had an existing loan balance of $100,000 or more without prior review of the loans by the senior loan committee. During 1978 and 1979, bank procedures required that a current financial statement, a statement made within 1 year of the date of the loan, be obtained for any loan over $5,000. For each loan made by the bank, a commercial loan note register was completed, usually by the loan officer making the loan. Each customer of the bank was given a unique account number that was used for all loans made in the customer's name. However, if a customer used a different name in taking out a loan, his unique account number would not be associated with the loan. In 1975, there was a change in management at the bank. Thereafter, the petitioner's loan authority was reduced. He resented his subsequent lack of promotions and felt that his salary increases were not adequate. He became embittered toward the bank. He wanted to hurt the bank as well as reward himself for the efforts he had made over the years on the *365 bank's behalf, and he wanted to help borrowers from the bank who were his friends. In early 1978, the petitioner began accepting kickbacks from some of his customers. Ciro Callico, Sr., was the first customer from whom the petitioner accepted kickbacks. Eugene Schaeffer was a long time friend of the petitioner. During 1979, the petitioner approved the disbursal of bank funds to Mr. Schaeffer, in the amounts and in the names indicated: Loan Number
Date of Loan
Name of Payee
Amount of Loan
1
3/27
Hillcrest Development
$ 59,000
2
4/20
Hillcrest Development
38,000
3
5/10
Abita Development
30,000
4
6/5
Abita Development
68,000
5
6/27
Ronald A. Stevens
60,000
6
6/28
Barbara Norman
24,500
7
9/26
Charles Develle
96,000
8
10/26
R. M. Arthur
85,000
9
10/26
F. A. Hayes
75,000
10
11/9
Charles Develle
18,000
11
11/9
David Develle
17,000
12
12/24
Charles Develle
60,000
13
12/24
Dr. Clifford Mayer
90,000
14
12/24
Richard Mouledous
50,000
15
12/27
Jim Christian
90,000
16
12/27
Marshall Pearce
95,000
17
12/27
George L. Rey
95,000
$1,050,500
The first six loans were to provide *366 funds to be used by General Resources, a corporation which was engaged in land development and in which Mr. Schaeffer had a one-half interest. General Resources had an outstanding loan balance such that additional loans could not be made to it without the approval of the bank's senior loan committee. The petitioner had attempted to obtain senior loan committee approval for loans to General Resources, but the committee turned down the application. Since the petitioner did not want his friend to lose what the petitioner felt was a meritorious business opportunity, he approved the disbursal of bank funds based on loan documentation in the names of the payees indicated. Whenever a name other than that of the individual who was actually to receive the funds had to be used to avoid bank loan committee review, the petitioner himself did not suggest the name to be used. Rather, he told the individual who was to receive the funds to suggest a name in which the loan could be made. The names used were either variations of the actual recipient's name or the name of a friend, relative, or employee of the recipient. Sometimes, the recipient had the person whose name was used actually *367 execute the loan documentation. The petitioner did not forge the names used for the loan documentation. The petitioner did not actually receive any of the proceeds from the first six Schaeffer loans, but during 1979, General Resources provided the petitioner with the use of a late model Lincoln Continental for which it paid the rental charges. In addition, the petitioner was given the opportunity to purchase four lots at a "good price" in a real estate project that General Resources was developing. The petitioner paid for the four lots with his note. At the time of trial, he still owned the lots, but he had not made a payment on the note since 1980. The proceeds of the 7th through 11th Schaeffer loans provided funds for a company called International Markets that traded in interest futures and commodity futures. In return for making the 7th through 11th Schaeffer loans, the petitioner received a 12.5-percent interest in Internatiional Markets, worth $125,000, for which he signed two notes totaling $125,000 in favor of General Resources. Any profits due the petitioner from International Markets were to be used to pay off the notes. The petitioner never made any payments *368 on the notes. After he was dismissed by the bank, the petitioner asked Mr. Schaeffer to arrange to have the petitioner's certificate evidencing his 12.5-percent interest in International Markets put in Mr. Schaeffer's name. The petitioner also requested an officer of International Markets to alter the corporate records so that the petitioner would not be shown as having been a stockholder. The 12th through 17th Schaeffer loans were to provide funds for Mr. Schaeffer to invest in Treasury bills. The documentation for these loans was in the names indicated because Mr. Schaeffer had an outstanding loan balance such that no further loans could be made to him without the approval of the bank's senior loan committee. After these loans were repaid with interest and Mr. Schaeffer paid any income taxes owed by him, the petitioner was to receive one-half of any profits Mr. Schaeffer made on his Treasury bill investments. Pursuant to this agreement, the petitioner actually received between $7,000 and $12,000, and was owed an additional $8,000 that was never paid to him. In 1980, the first six Schaeffer loans, which had an outstanding balance of $643,347.48, were consolidated *369 into an account titled General Resources. As of October 31, 1983, that account had an outstanding balance of $249,378.61. The 7th through the 17th Schaeffer loans were repaid prior to October 31, 1983. Ciro Callico, Sr., was a close friend of the petitioner. During 1978 and 1979, the petitioner approved the disbursal of bank funds to Mr. Callico in the amounts and in the names indicated: Loan
Amount of Loan
Number
Date of Loan
Name of Payee
1978
1979
1
1/27/78
Vicent J. Piazza
$ 22,000
2
8/2/78
Vincent J. Piazza
10,000
3
9/25/78
Vincent J. Piazza
20,000
4
10/30/78
Alex Henig
8,000
5
12/15/78
Juan Juarez
75,000
6
12/19/78
Vincent J. Piazza
10,000
7
12/27/78
Alex Henig
70,000
8
5/10/79
Florence Dupuy
$ 60,000
9
6/4/79
Florence Dupuy
39,000
10
6/11/79
John Roblez
23,000
11
6/21/79
Margarita Deoliveria
24,000
12
7/12/79
Lillie Mae Skidmore
24,500
13
7/20/79
Sandra Vigil
24,000
14
8/6/79
Juan Juarez
8,000
15
8/30/79
Roosevelt Hargett
24,000
16
10/2/79
Gabriel Shaheen
24,200
17
10/26/79
L. M. Duplessis
7,700
18
12/26/79
Ardyl H. Piazza
23,000
19
11/5/79
L. M. Duplessis
9,000
20
12/7/79
Ella Martin
20,000
$215,000
$310,400
*370 As of January 27, 1978, Mr. Callico had an outstanding loan balance such that no further loans could be made to him without the approval of the bank's senior loan committee. For this reason, loans made to Mr. Callico in 1978 and 1979 were made in the names of other payees. Although Mr. Callico's financial situation may have been sound, he was frequently substantially overdrawn at the bank during this period. The petitioner received cash kickbacks from Mr. Callico of $10,000 in 1978 and $20,000 in 1979, as well as various other gifts worth $1,000 in 1979. From the second Callico loan, $9,000 was used to purchase an automobile for the petitioner in 1978. With respect to the 17th and 19th Callico loans, the petitioner had Lillie Mae Skidmore, an employee of Mr. Callico, sign two blank notes using the name L. M. Duplessis. At that time, the bank had lent Mrs. Skidmore a total of $24,500. It was the petitioner's idea to use a name other than Skidmore. The petitioner received $16,000 of the proceeds of the loan, $16,700; Mrs. Skidmore received $700. The petitioner did not expect Mrs. Skidmore to repay more than the $700 that she actually received. The petitioner *371 kept the $16,000 in his desk. After he was dismissed by the bank in 1980, he gave the $16,000 to Mr. Callico, and Mr. Callico paid off both loans. The proceeds from the 7th Callico loan, $70,000, were used by Mr. Callico to buy a shopping center. The petitioner and Mr. Callico agreed that the petitioner would receive one-half of the rental income from the shopping center. For 3 or 4 months in 1979, the petitioner received approximately $200 per month as his share of such rental income. During 1979, the petitioner also arranged the sale of a diamond ring for Mr. Callico, and the petitioner received one-half of Mr. Callico's $10,000 profit. The petitioner and Mr. Callico twice traveled to Las Vegas together. During 1979, they traveled together once to New York. Mr. Callico paid most of their expenses on the trips to Las Vegas and New York. In 1980, the 1st, 5th, 8th through 16th, and 20th Callico loans were consolidated, together with a $275,000 note signed by Mr. Callico, into an account in the name of Ciro Callico. Initially, the account had a balance due of $1,320,619.18. As of October 31, 1983, the balance due was $1,224,235.88. As of October 31, 1983, the *372 7th and 18th Callico loans remained substantially unpaid. The 2d, 3d, 4th, 6th, 17th, and 19th Callico loans were repaid prior to October 31, 1983. During the years at issue, the petitioner was involved in a close and intimate personal relationship with Dolores Milstead. In 1975 or 1976, he began making small loans of bank funds to her, which were used by her to pay bills and living expenses. Such loans were not repaid by Ms. Milstead, but were instead refinanced and consolidated into later loans. Ms. Milstead was not wealthy. However, as of August 28, 1978, she had an outstanding loan balance in her own name at the bank of approximately $100,000. As of August 1978, her only assets were a car and two $10,000 life insurance policies. Her maximum earnings, up to that time, had been between $5,000 and $7,000 per year. During 1978 and 1979, the petitioner approved the disbursal of bank funds to Ms. Milstead in the amounts and in the names indicated: Loan
Amount of Loan
Number
Date of Loan
Name of Payee
1978
1979
1
8/28/78
Lena P. Apken
$24,800.00
2
9/14/78
Lena P. Apken
42,000.00
3
9/25/78
Lena P. Apken
30,000.00
4
10/17/78
Jimmie M. Noble
35,000.00
5
11/30/78
Jimmie M. Noble
35,000.00
6
12/21/78
Lena P. Apken
11,000.00
7
1/29/79
Lena P. Apken
$ 6,000.00
8
2/8/79
Derek and Mary A. Reese
95,000.00
9
2/12/79
Ann Shaner
75,000.00
10
3/1/79
Bernadette Sneeringer
98,394.97
11
3/29/79
Lena A. Pecoraro
95,000.00
12
5/2/79
Theresa A. Francoise
85,000.00
13
5/10/79
C. Kennedy
35,000.00
14
6/1/79
C. Kennedy
44,000.00
15
6/27/79
Dolores Pugh
23,000.00
16
6/27/79
Myrtle P. Davis
24,000.00
17
8/1/79
Theresa A. Francoise
80,000.00
18
8/1/79
Larry E. Kapoun
60,000.00
19
8/6/79
Madeline A. Freeman
60,000.00
20
8/13/79
Ann M. Allen
75,000.00
21
8/13/79
Anthony Gandolfo
75,000.00
22
8/31/79
Louis Laurent
24,500.00
23
8/31/79
Jean Lane
23,800.00
24
8/31/79
Kenneth Turner
23,500.00
25
10/5/79
Collette Reese
24,000.00
26
10/4/79
Shirley D. Maltese
24,300.00
27
10/26/79
J. T. Nettles
23,500.00
28
10/26/79
Charles W. Lane
82,000.00
29
10/26/79
W. J. Parnell
61,000.00
30
10/30/79
A. J. Kostmayer
81,000.00
31
12/10/79
Collette Reese
47,500.00
32
12/10/79
Louis Laurent
48,000.00
$177,800.00
$1,393,494.97
*373 The documents for the 32 Milstead loans were in the names indicated because, at the time of the first loan, Ms. Milstead's loan balance, approximately $100,000, was such that the petitioner knew that the bank's senior loan committee would not approve any further loans to her. During 1978 and 1979, Ms. Milstead spent approximately $81,000 for jewelry, including $27,000 for an emerald-cut diamond ring, and she purchased a fur jacket and a fur coat. During the same period, she also purchased, in succession, three Cadillacs and two Mercedes, as well as an automobile for her daughter. The petitioner was aware that she was making these purchases. During 1978 and 1979, Ms. Milstead spent between $15,000 and $20,000 on furnishings for her apartment. In addition, she loaned one of her sisters money to buy a house, and she loaned another sister money to buy a condominium. Through 1978 and 1979, Ms. Milstead earned a total of between $25,000 and $27,000 as a read estate agent. Some of the funds from the Milstead loans were used by Ms. Milstead to make investments in industrial real estate in Sorrento, La. The profit on the sale of the Sorrento property was expected *374 to be $45,000. Ms. Milstead also purchased property in Florida, including a townhouse for $58,000, a condominium for $68,000, two commercial lots for $140,000, and she made a $5,000 downpayment on a second condominium. During 1978 or 1979, she also invested in a dance studio. In approximately August 1978, the petitioner and Ms. Milstead agreed that she would give him one-half of her real estate commissions and one-half of the profits from her real estate investments and dance studio. Such agreement came about at the request of the petitioner. Pursuant to their agreement, Ms. Milstead paid the petitioner at various times $52,500 in 1978 and $117,800 in 1979. At the petitioner's instruction, the method of payment was for Ms. Milstead to leave an envelope containing $100 bills on the petitioner's desk at the bank. During 1978 and 1979, Ms. Milstead also gave the petitioner a Rolex watch, a painting, money to buy a cashmere overcoat, a medal and chain, and two gift certificates. At the instruction of officials of the bank, the petitioner visited Ms. Milstead on February 3, 1980, to discuss her outstanding loans. At that time, Ms. Milstead's assets had a value of less *375 than one-half of what she owed the bank. As of October 31, 1983, the balance outstanding on the 32 Milstead loans was $1,022,694.97, which does not include an outstanding balance of $97,957.05 in her own name. Ms. Milstead was subsequently sued by the bank. Frank J. D'Acquisto had been an acquaintance of the petitioner for between 12 and 15 years as of the date of trial. During 1979, the petitioner approved the disbursal of bank funds to Mr. D'Acquisto in the amounts and in the names indicated: Loan Number
Date of Loan
Name of Payee
Amount of Loan
1
1/31
Rosaleen D. Acquisto
$ 50,000
2
2/8
Frank J. D'Acquisto
50,000
3
4/3
Patrick DiSalvo
98,000
4
6/4
Rosaleen D'Acquisto
49,000
5
7/17
Rosaleen Clipperton
24,700
6
7/17
Marilyn DiSalvo
24,800
7
7/17
Marilyn C. Walker
24,500
8
8/31
Joseph Gassiraro
19,000
9
8/31
Robert Walsh
21,000
10
9/12
George Hartman
24,600
11
10/4
Howard E. Gurvitz
24,700
12
10/4
J. Digby Matheson
24,500
13
10/4
Lee E. Miller
24,500
14
10/4
Charles H. Nelson
24,800
15
10/23
Donald Bader
50,000
16
10/23
Louis Fragnassi
24,000
17
10/29
Charles Trumbetta
24,800
18
12/27
Ciro Callico, Sr.
275,000
[2] $857,900
*376 As of February 8, 1979, Mr. D'Acquisto had an outstanding loan balance at the bank of $99,000, and therefore, no further loans could have been made to him without the approval of the bank's senior loan committee. The petitioner received cash kickbacks from Mr. D'Acquisto of $1,000 in 1978 and of $12,000 in 1979. The first seven D'Acquisto loans provided funds for D & D Enterprises, a partnership engaged in the construction of single-family homes in Las Vegas, Nev. The petitioner was to receive one-third of the profits of D & D Enterprises after all loans, interest, and expenses were paid. The 10th through the 17th D'Acquisto loans were used to finance two illegal drug purchases. The first drug purchase took place in Florida and involved approximately $100,000. The second took place in Louisiana and involved approximately $150,000. Both drug purchases resulted in the arrest of some of the participants; during the second drug purchase, one of the principals was arrested. The petitioner was to receive *377 $1 million in cash for financing the first drug purchase and $400,000 in cash for financing the second drug purchase. At the time he approved these loans, the petitioner knew that the proceeds would be used to finance drug purchases. As a favor to the petitioner, Mr. Callico executed the loan documents for the 18th D'Acquisto loan. Some of the proceeds of the loans were used to pay back the 10th through the 17th D'Acquisto loans, which totaled $221,900. The petitioner used the remaining money to provide $25,000 for additional bail for one of the parties involved in the second drug purchase. The 1st, 4th, 8th, and 9th D'Acquisto loans were repaid prior to October 31, 1983. The 2d D'Acquisto loan was substantially repaid prior to that time. The 3d and 5th through 7th D'Acquisto loans remained substantially unpaid as of October 31, 1983. During 1978 and 1979, Shelbie Mitchel was a friend of the petitioner with whom he had an intimate relationship. As of July 7, 1978, she had an outstanding loan balance at the bank of $13,374. During 1978 and 1979, the petitioner approved the disbursal of bank funds to Ms. Mitchel in the amounts and in the names indicated: Loan
Amount of Loan
Number
Date of Loan Name of Payee
1978
1979
1
7/7/78
Shelbie Mitchel
$ 5,000
2
8/7/78
Shelbie Mitchel
15,000
3
2/13/79
Shelbie Mitchel
$ 5,000
4
3/29/79
Shelbie Mitchel
15,000
5
6/29/79
S. Booty
24,700
6
7/13/79
Shelbie Mitchel
20,000
7
8/21/79
Natalie Mitchel
24,000
8
11/7/79
Sandy A. Taylor
15,000
9
12/24/79
Beatrice Powell
18,000
$20,000
$121,700
*378 As of July 13, 1979, the outstanding loan balance in Ms. Mitchel's name at the bank was $99,374.20. Accordingly, no further loans could be made to her without the approval of the bank's senior loan committee. If the petitioner had presented the requests to that committee, he knew that it would not have approved further loans to her, and her outstanding loan balance would have caused concern at the bank. The petitioner agreed to provide funds to Ms. Mitchel to enable her to go into the real estate business. He was to receive one-half of any profits or commissions that she earned. From the proceeds of the 3d through the 9th Mitchel loans, $40,000 was invested by the petitioner in Las Vegas with a man named Frank Perry. The petitioner made these investments through Mary Lou Maberry. Mr. Perry was supposed to double the money invested with him over a short period of time. Over the period from April through October 1979, the petitioner invested a total of $250,000 to $300,000 with Mr. Perry. Such funds were derived from loans made to various customers of the petitioner. The petitioner lost most of the money that he invested with Mr. Perry. In 1980, he was able to *379 recover only about $45,000. Ms. Maberry was a close personal friend of the petitioner and lived in Las Vegas. All of the investments made by the petitioner with Mr. Perry were made in her name. As far as Ms. Maberry knew, all of the funds invested by her for the petitioner with Mr. Perry were being invested on the petitioner's behalf. Ms. Maberry was not aware that persons other than the petitioner were involved. During 1979, in connection with loans he approved for Ms. Maberry, the petitioner received cash kickbacks totaling $4,000. The petitioner and Ms. Mitchel had agreed that after the $40,000 borrowed from the bank was repaid, they would share equally in any profits. During 1979, the petitioner received cash kickbacks totaling $4,000 from Ms. Mitchel. Ms. Mitchel was not aware of any of the details of the investments made with Mr. Perry. The petitioner felt responsible for repaying the amounts loaned to Ms. Mitchel. The reason he invested money with Mr. Perry was that he doubted her ability to repay her loans. The petitioner was also concerned about what would happen to him if her loans were not repaid since such failure might cause the bank to examine *380 other loans made by the petitioner. The 3d Mitchel loan was repaid prior to October 31, 1983, and $9,000 was repaid on the 4th loan prior to the same time. The remaining Mitchel loans were substantially unpaid as of October 31, 1983. In 1978, the petitioner met Bernard Wade, who was starting a commercial photography business. Mr. Wade obtained his first loan in the amount of $7,000 from the bank prior to October 24, 1979, and it was guaranteed by Ruth Ann Menutis. Thereafter, funds from the bank financed his photography studio and modeling agency in New Orleans, as well as his attempt to open a studio in New York City. During 1979, the petitioner approved the disbursal of bank funds to Mr. Wade in the amounts and in the names indicated: Loan Number
Date of Loan
Name of Payee
Amount
1
10/24
Ester Wade
$ 15,000
2
11/13
Leon Bernard
23,000
3
11/26
Morris Collins
74,000
$112,000 Mr. Wade followed, without question, the petitioner's directions; he "looked up to" the petitioner. Mr. Wade gave his bank statements to the petitioner, and he signed blank notes and blank checks for the petitioner. As of October 24, 1979, Mr. *381 Wade and his businesses had an outstanding loan balance at the bank of approximately $300,000. At that time, Mr. Wade's financial condition was not sound, and it developed that he did not have the financial ability to repay his loans. Mr. Wade and the petitioner had agreed that the petitioner would receive one-half of the profits from Mr. Wade's businesses after repayment of the loans. Pursuant to their agreement, Mr. Wade paid the petitioner $8,000 in cash. Sometime thereafter, the petitioner paid a $4,000 limousine bill for Mr. Wade. Mr. Wade also gave the petitioner a Nikon camera, a cashmere overcoat, and a leather briefcase. The petitioner received $39,000 from the 3d Wade loan. Of that amount, $35,000 was used to provide bail for one of the principals involved in the second drug purchase; the petitioner retained the other $4,000. The petitioner did not expect Mr. Wade to repay the $39,000 received by the petitioner from the 3d Wade loan. As of October 31, 1983, none of the three Wade loans had been repaid. Mr. Wade was subsequently criminally convicted as a result of bank funds being disbursed to him. Kris Carr was a friend of the petitioner with whom *382 he was occasionally intimate. During 1978 and 1979, her financial condition was unsound. As of August 2, 1979, the outstanding loan balance in Ms. Carr's name at the bank was approximately $22,700. As of the same date, the outstanding loan balance in the name of Wicker Basket, Inc. (Wicker Basket), a corporation wholly owned by Ms. Carr, was $24,800. On August 20, 1979, an additional $10,000 loan was made to the Wicker Basket by the bank. As a consequence of the outstanding loan balances in the names of Ms. Carr and the Wicker Basket, no further loans could be made to either of them without review by the divisional loan review committee. Thereafter, the petitioner told Ms. Carr that she would have to provide additional names for any further loans. During 1979, the petitioner twice approved the disbursal of banks funds to Ms. Carr: On August 2, 1979, he approved a loan of $20,000 to her in the name of K. R. Broderson, and on October 26, 1979, he approved a loan of $10,000 to her in the name of Robin Carr. At the suggestion of the petitioner, he and Ms. Carr agreed that he would receive one-half of the profits from the Wicker Basket after repayment of the loans. *383 Earlier, the petitioner had helped Ms. Carr in another business called Stenographer's Unlimited. The proceeds from the 1st Carr loan were invested in Las Vegas with Mr. Perry. Ms. Carr was not aware of any of the details of the investment, and she did not know about Ms. Maberry. The petitioner and Ms. Carr agreed to divide the profits from the investment after repayment of the loan. At the time he was approving loans for Ms. Carr, the petitioner told her that he needed money on a number of occasions. She gave him a total of $4,100 in cash during 1979. Although he had stated that he would repay Ms. Carr, none of the $4,100 has ever been repaid. As of October 31, 1983, the two Carr loans had not been repaid to the bank. Paula Boyer was a close personal friend of the petitioner with whom he was occasionally intimate. She had lived in New Orleans for a number of years. During 1979, she was attempting to enter the real estate business in Dallas, Tex. At that time, her financial condition was unsound. As of September 20, 1979, Ms. Boyer's outstanding loan balance with the bank was such that loan committee review would have been necessary in order for her to obtain any additional *384 loans from the bank. During 1979, the petitioner twice approved the disbursal of bank funds to Ms. Boyer: On September 20, 1979, he approved a loan of $20,000 to her in the name of Lurline Houston, and on November 15, 1979, he approved a loan of $24,600 to her in the name of Donna L. Cromacher. The petitioner and Ms. Boyer had agreed that they would divide her real estate commissions and any profits on her real estate investments. Pursuant to their agreement, Ms. Boyer paid the petitioner $5,000. As of October 31, 1983, the two Boyer loans had not been repaid to the bank. Earline Johnson was a friend of the petitioner with whom he was occasionally intimate. In 1979, she returned to New Orleans and did not have a job. On December 20, 1979, the petitioner approved a loan of $7,000 to her in the name Earline F. Johnson. The money was used by her to buy an automobile. At the time he approved the loan, the petitioner told her not to worry about making loan payments. The petitioner also had Ms. Johnson sign a blank note and a blank check. In 1980, he used the note to disburse $48,000 of the bank's funds, and he used the check to obtain a bank check in that amount. *385 The petitioner used the $48,000 to buy a diamond ring, which he hoped to sell at a sufficient profit to pay back the $48,000 and the $7,000 disbursed to Ms. Johnson. The petitioner told her about the diamond ring sometime after he had purchased it. As of October 31, 1983, neither the $7,000 nor the $48,000 had been repaid to the bank. Betty Norman Smith was a janitorial employee at the bank. Norman was her maiden name. As of July 12, 1979, Mrs. Smith had an outstanding loan balance at the bank of $20,487.65. In order to avoid loan committee review, the petitioner suggested that Mrs. Smith use a different name for any further loans. On July 19, 1979, the petitioner approved the disbursal of $20,000 in bank funds supported by loan documentation in the name of Betty Norman. At that time, the petitioner was concerned about Mrs. Smith's ability to repay the prior loan, since she was not making payments on it. The $20,000 disbursed on July 19, 1979, was invested by the petitioner in Las Vegas with Mr. Perry through Ms. Maberry. The petitioner made the investment with Mr. Perry in order to Help Mrs. Smith repay her outstanding loan. The petitioner and Mrs. Smith *386 had agreed to divide any profits, after repayment of the loans, from the investment with Mr. Perry. Mrs. Smith was not aware of any of the details of this investment. As of October 31, 1983, the $20,000 disbursed on July 19, 1979, had been repaid to the bank. Diane Frilot was a woman with whom the petitioner was occasionally intimate. During 1978 and 1979, her financial condition was unsound. The petitioner met Ms. Frilot at Tranchina's, a restaurant owned by Mr. Callico, where she was a waitress. At that time, she was not aware that the petitioner worked at the bank. On August 25, 1978, Ms. Frilot was in the bank and the petitioner motioned her over to his desk. He asked her whether she needed any money, and when she said that she did, he offered her a loan of $1,000. Ms. Frilot signed a note for that amount. The next day she returned to her job at Tranchina's, but since her daughter was ill, she left Tranchina's and did not return to her job. Between August 25, 1978, and October 23, 1978, the petitioner approved loans from the bank to Ms. Frilot totaling $19,000. Ms. Frilot spent this money on herself and her family. As of March 9, 1979, the outstanding loan *387 balance in Ms. Frilot's name was $44,000. During 1979, the petitioner approved the disbursal of bank funds to Ms. Frilot in the amounts and in the names indicated: Loan Number
Date of Loan
Name of Payee
Amount of Loan
1
3/9
Diane Frilot
$ 6,000
2
4/5
Diane Frilot
12,000
3
5/3
Diane Frilot
9,000
4
6/5
Diane Frilot
15,000
5
7/2
Diane Ryan
24,000
6
8/7
Diane Frilot
17,000
7
9/10
Viola Ryan
24,500
8
10/3
Mrs. Randy Bouver
7,500
9
10/24
Mrs. Randy Bouver
7,500
$122,500 From the Frilot loans, $20,000 was invested by the petitioner in Las Vegas with Mr. Perry through Ms. Maberry. The petitioner told Ms. Frilot that he was going to repay the loans from the profits on investments and that she did not have to worry about repaying them. Ms. Frilot was not aware of any of the details of the investments made by the petitioner with Mr. Perry. From the Frilot loans, $15,000 was invested by the petitioner in a company named Armonol. Initially, the petitioner made this investment in his own name. Ms. Frilot did not know about the Armonol investment until 1980. In that year, the petitioner requested that the Armonol *388 stock be reissued in Ms. Frilot's name, and he asked the president of Armonol not to reveal that the stock had ever been in his name. During 1978 and 1979, Ms. Frilot gave the petitioner, at his request, the following amounts of cash: Date
Amount
10/30/78
$ 1,000
2/14/79
1,000
4/5/79
2,300
5/3/79
2,200
6/5/79
3,500
8/7/79
3,000
10/3/79
3,000
10/24/79
2,000
$18,000 The petitioner suggested the amounts of such payments, and he asked her to give him such payments in new $100 bills. In 1979, the petitioner deposited $1,500 in Ms. Frilot's account to cover overdrafts; in 1980, he deposited $8,500 for the same purpose. At the time he requested cash from her, the petitioner did not tell Ms. Frilot that the cash she was giving him was to cover her overdrafts. Ms. Frilot had a ninth grade education and was naive regarding financial matters. Prior to her involvement with the petitioner, she had never had a bank account and never had much money. Ms. Frilot did as the petitioner told her; she did not think that she was doing anything illegal. As of October 31, 1983, none of the Frilot loans had been repaid to the bank. The bank *389 never sued Ms. Frilot to recover its money. The cash kickbacks were paid to the petitioner in currency, usually in $100 bills. The petitioner was aware that cash was less easy to trace. He did not deposit the cash kickbacks into his bank account; rather, he kept the cash either in his desk drawer or in his safe deposit box. When the petitioner received the kickbacks, he was aware that they were kickbacks and that it was both wrong and illegal to accept them. On various occasions, in disbursing bank funds, the petitioner had the bank issue two or more smaller checks, rather than a single large check, in order to make the checks easier to convert into cash and to avoid currency transaction reporting requirements. The petitioner prepared joint Federal income tax returns for himself and his wife for 1978 and 1979. At the time he prepared the returns, he was aware that kickbacks were income. Nevertheless, the returns did not include the kickbacks as income. In early 1980, the bank commenced an investigation of irregularities in certain loans made by the petitioner. His lending authority was suspended, and he was questioned extensively by bank officials. On February 22, 1980, the *390 petitioner's employment with the bank was terminated. At that time, he had $90,000 to $100,000 in cash in his desk, which he took with him when he left the bank. This amount consisted of cash kickbacks and money that he was holding for investment purposes. During the initial investigation of the petitioner by the bank in January and February 1980, the petitioner was not honest with the bank. He did not tell the bank about the kickbacks that he had received, nor did he tell the bank about the interests that he had received in various businesses from the persons to whom he had disbursed bank funds. In addition, the petitioner lied to the Federal Bureau of Investigation during its investigation of him. The petitioner also asked a number of the people questioned in the investigation to lie in order to protect him. During the petitioner's meeting on February 3, 1980, with Ms. Milstead, she informed him that she had entered his name in her checkbook every time that she had given him cash kickbacks. The petitioner asked Ms. Milstead to remove such notations from her checkbook. He also asked Mr. Wade to tell investigators and the grand jury that Mr. Wade received all of *391 the proceeds from the Wade loans. After the bank began its investigation of the petitioner, he asked Ms. Carr to sign a document which stated that he did not receive any money from her. After he was dismissed by the bank, he asked Ms. Frilot to tell the bank and the grand jury that she had never given him any cash. On June 5, 1980, the petitioner first appeared before a Federal grand jury which was investigating certain loans that he had made. At that time, he lied to the grand jury concerning a number of matters. In his testimony, he tried to make it appear as though he had merely made some bad loans but that he had not benefitted personally. He did not tell the grand jury about the kickbacks that he received, about his part in the drug purchases, or about the interests in various businesses that he had received. The petitioner later failed a lie detector test, and thereafter, he recanted his previous grand jury testimony. He did not recant his prior testimony because of a change of heart; he did so because he feared that the truth would be discovered. In August 1980, the petitioner was indicted by a Federal grand jury and charged with violating 18 U.S.C. section 656 *392 with respect to the loans described herein, and his pled guilty to such charges. In his notice of deficiency, the Commissioner determined that the petitioner received unreported income as a result of his disbursal of bank funds of $412,800.00 in 1978 and $4,070,094.97 in 1979. The Commissioner also determined that the petitioner received an additional $30,000.00 in unreported income in 1978 and an additional $216,000.00 in unreported income in 1979 as a result of his receipt of kickbacks. Finally, the Commissioner determined that the petitioner was liable for the addition to tax under section 6653(b) for fraud in 1978 and 1979. The parties have agreed that Mrs. Lota is an innocent spouse under section 6013(e) and is not liable for any deficiency in tax at issue in this case. OPINION The first issue for decision is whether the petitioner received unreported income during the years at issue in the amounts determined by the Commissioner as a result of his disbursal of bank funds to various individuals. The petitioner argues that he did not realize income as a result of his disbursal of bank funds to the various individuals in the present case because true loans were *393 created between the bank and the recipients of the funds. In support of such argument, he contends that, at the time of such disbursements, he was acting within the scope of his authority as an agent of the bank. In the alternative, he contends that novations took place when, after the bank discovered the petitioner's activities, it accepted renewal notes and rewrote various loans in the names of the individuals who actually received the funds. The petitioner's arguments are wholly without merit. He was not acting within the scope of his authority as an agent of the bank at the time he authorized the disbursal of bank funds at issue. Nor can the bank's attempts to recoup its funds after its discovery of the petitioner's activities be said to have created novations such that true loans were created between the bank and the various recipients of the funds in 1978 or 1979. The law with respect to this issue is clear. In Estate of Geiger v. Commissioner,352 F.2d 221 (8th Cir. 1965), affg. a Memorandum Opinion of this Court, the taxpayer, under circumstances similar to those in the present case, argued that she should not be taxed on funds that were disbursed *394 directly from the bank to various recipients and did not actually pass through her hands. In rejecting the taxpayer's contentions, the Eighth Circuit wrote: That may be one way to describe it. Another, equally valid, is that the funds came to Mrs. Geiger and were passed out or made available by her to the beneficiaries. These beneficiaries were the objects of her bounty, not the bank's. She was the force and the fulcrum which made those benefits possible. She assumed unto herself actual command over the funds. This is enough. Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930). We are not sympathetic with the claim that, because she may not have used the funds for personal needs, she is not to be taxed. She enjoyed benefits of a kind which obviously must have loomed large in her mind and have been important to her--status as the beneficent donor to good causes and favored acquaintances, a reputation as an available fried in need, the acquisition, with respect to a "loan", of the resulting obligation to her, and the like. Helvering v. Horst, * * * [311 U.S. 112, 116-117 (1940)]. * * * [352 F.2d at 231-232.] *395 In Bailey v. Commissioner,52 T.C. 115 (1969), affd. per curiam 420 F.2d 777 (5th Cir. 1969), we followed Estate of Geiger v. Commissioner,supra, under facts again similar to those in the present case. Nothing in the present case warrants a conclusion different from that in Estate of Geiger and Bailey. The petitioner was the "force and fulcrum" which made it possible for the various individuals in this case to obtain the bank's funds. Indeed, as in Estate of Geiger, the petitioner, in effect, assumed actual command over the bank's funds. Some of the loans were, in fact, repaid to the bank in 1980, and arrangements may have been made in that year for the repayment of other loans. However, as that year is not before us in the present case, we express no opinion as to whether such repayments constitute restitution by the petitioner so as to entitle him to a deduction for the amounts repaid. See James v. United States,366 U.S. 213, 220 (1961); Flynn v. Commissioner,T.C. Memo. 1981-491; Rev. Rul. 65-254, 1965-2 C.B. 50. Our conclusion with respect to the legal *396 principle applicable in the present case does not, however, fully resolve the issue before us. It is clear that, in certain instances, funds disbursed, ostensibly as loans, by the petitioner to some of the individuals were used to pay off loans that were made previously and had come due. For example, the 18th D'Acquisto loan, which was disbursed on December 27, 1979, in the name of Mr. Callico, was used to repay the 10th through the 17th D'Acquisto loans which totaled $221,900. In addition, during 1979, the petitioner deposited $1,500 in Ms. Frilot's account to cover overdrafts. Although the petitioner claims to have deposited additional amounts to cover Ms. Frilot's overdrafts, on the record before us, he has not shown that he in fact did so. Under such circumstances, it cannot fairly be concluded that the petitioner received income to the extent that funds were used to pay off previous loans. Unfortunately, the petitioner, who has the burden of proof on this issue (Rule 142(a), Tax Court Rules of Practice and Procedure[3]; Welch v. Helvering,290 U.S. 111 (1933)), did not seek to identify other instances where funds disbursed by him were used to *397 pay off prior loans made to the various individuals. Accordingly, on the record before us, we conclude that the petitioner had $412,800.00 in unreported income in 1978, the amount determined by the Commissioner, and $3,846,694,97 in unreported income in 1979 as a result of his unauthorized disbursal of bank funds during those years. The second issue for decision is to what extent the petitioner realized income during the years at issue as a result of kickbacks received by him. The petitioner admits that he received $10,000 in kickbacks during 1978 and $37,000 in kickbacks during 1979. However, the petitioner's admitted kickback income is far less than the amounts asserted by the Commissioner. The Commissioner argues that we must consider the various disbursals of bank funds and the attendant kickbacks as separate transactions. Thus, he argues that the disbursals, even though not actually received by the petitioner, are nevertheless taxable to him, and he argues that there has been no factual showing that the kickbacks were paid out of the bank funds disbursed by the petitioner to the various *398 individuals. Essentially, this issue is a subsidiary issue of the first issue for decision. The Commissioner's contention that the petitioner must include in income all the kickbacks received by him in conjunction with his disbursal of bank funds during 1978 and 1979 simply goes to far. The Commissioner's contention would result in taxing certain funds twice, a result not warranted under the facts in the present case. Although the Commissioner may be technically correct in that the petitioner has not shown that in each case the bank funds disbursed by him were the same funds used to make the kickbacks, the facts in the present case are such that it is altogether obvious that the kickbacks were paid out of the funds disbursed by the petitioner as ostensible loans. In the case of most of the individuals, they had no other source out of which to pay kickbacks to the petitioner. Taxation is a practical matter. In the present case, the practical approach, indeed the only fair approach, is to look at the "loan" disbursals and the kickbacks as parts of single transactions. The kickbacks paid to the petitioner were paid because the petitioner made the loans. Thus, since *399 we have already concluded that the disbursals are taxable to the petitioner to the extent they were not used to repay prior loans, the kickbacks are not additional taxable income to the petitioner. The third issue for decision is whether the petitioner is liable for the addition to tax for fraud under section 6653(b) for either of the years at issue. Section 6653(b) provides that if any part of any under-payment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651, 654-655 (3d Cir. 1974); Miller v. Commissioner,51 T.C. 915, 918 (1969). The Commissioner will carry his burden if he shows that the taxpayer intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); *400 Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Circumstantial evidence is permitted where direct evidence of fraud is not available. Spies v. United States,317 U.S. 492, 499 (1943); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. at 200. Fraud may properly be inferred where an entire course of conduct establishes the necessary intent. Rowlee v. Commissioner,supra;Stone v. Commissioner,56 T.C. 213, 223-224 (1971). The precise amount of underpayment resulting from fraud need not be proved. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). *401 The statute requires only a showing that "any part" of an underpayment results from fraud. However, the Commissioner must show fraud resulting in an underpayment for each taxable year for which he claims the addition. Otsuki v. Commissioner,supra.
In the present case, there is overwhelming evidence clearly establishing that the petitioner fraudulently underpaid his income tax during the years at issue. The petitioner personally prepared the petitioners' income tax returns for 1978 and 1979. By his own admission, the petitioner knowingly understated his taxable income at least in the amount of the conceded kickbacks, $10,000 in 1978 and $37,000 in 1979. Such a consistent pattern of under-reporting substantial amounts of income, standing alone, is persuasive evidence of fraud. See Adler v. Commissioner,422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this *402 Court; see also Harper v. Commissioner,54 T.C. 1121, 1139 (1970), and cases cited therein. The petitioner contends that he did not attempt to conceal income from the Commissioner. He argues that the various acts relied on by the Commissioner to show fraud are not evidence of fraudulent intent with respect to the underpayment of his income taxes, but rather, were directed at attempting to conceal his activities from the bank and from the FBI. As we have previously observed, "it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax." McGee v. Commissioner,61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), citing Rogers v. Commissioner,111 F.2d 987 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). However, in the present case, we need not rely solely on such inference. Here, we have a sophisticated taxpayer, an individual who was both a lawyer and a banker during the years at issue, and who *403 orchestrated an elaborate fraudulent scheme. The petitioner received substantial personal benefits from this scheme in the form of cash kickbacks, gifts, and the various business interests that he received from the individuals involved. As far as we know, the petitioner dealt almost exclusively in cash when receiving kickbacks. McGee v. Commissioner,61 T.C. at 260. In addition, he had checks issued in amounts less than $10,000 in order to avoid Federal reporting regulations. While it may be true that the petitioner's immediate concern was to conceal his activities from the bank and later from the FBI, it is clear that the petitioner was aware of his obligation to correctly report his taxable income. He knew at the very least that kickbacks were taxable income, and he knowingly omitted kickbacks from his 1978 and 1979 income tax returns. On the record before us, we hold that the Commissioner has shown by clear and convincing evidence that some part of the petitioner's underpayment of tax for both 1978 and 1979 was due to fraud within the meaning of section 6653(b). Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.↩
2. The joint exhibit containing the various disbursals made by the petitioner which are at issue in this case incorrectly shows this sum as $875,900.↩
3. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩