RONALD A. PUPPE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BARBARA R. TEATS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Puppe v. Commissioner
Docket Nos. 35551-85; 35762-85.
United States Tax Court
T.C. Memo 1988-311; 1988 Tax Ct. Memo LEXIS 333; 55 T.C.M. (CCH) 1297; T.C.M. (RIA) 88311; July 25, 1988; As amended July 27, 1988 William Lucas, for the petitioner in docket No. 35551-85. Robert Musselman, for the petitioner in docket No. 35762-85. John Schmittdiel, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT *336 AND OPINION WELLS, Judge: In these consolidated proceedings, [1] respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Petitioner
Year
Deficiency
[2] Section 6653(b) Ronald A. Puppe
1979
[3] $ 72,977
$ 37,791
1980
3,578    - 0 -   Barbara R. Teats
1979
$ 93,779   $ 46,889
Respondent has taken a whipsaw position, in that he sent to each petitioner *337 a statutory notice of deficiency in which he determined that each such petitioner was liable for taxes and additions to tax based upon the full amount of certain embezzled funds. After concessions the following issues are presented for decision: (1) whether petitioner Ronald A. Puppe ("petitioner Puppe") had unreported embezzlement income and, if so, the amount of such income; (2) whether petitioner Barbara R. Teats ("petitioner Teats") had unreported embezzlement income and, if so, the amount of such income; (3) whether for his taxable year 1982, petitioner Puppe had a net operating loss; (4) whether petitioner Puppe is liable for an addition to tax for fraud under section 6653(b); and (5) whether petitioner Teats is liable for an addition to tax for fraud under section 6653(b). FINDINGS OF FACT At the time he filed his petition in this case, petitioner Puppe resided in Burnsville, Minnesota. At the time she filed her petition in this case, petitioner Teats resided in Alexandria, Virginia. During the entire calendar year 1979, petitioner Puppe and Judy K. Puppe ("Mrs. Puppe") were married to each other, but they were separated. Petitioner Puppe and Mrs. Puppe timely filed *338 a joint return for taxable year 1979, on which they reported taxable income of $ 4,095. Petitioner Teats timely filed a return for taxable year 1979, on which she reported taxable income of $ 9,428. Petitioners Teats and Puppe were romantically involved with each other and were living together during 1979. During 1979, petitioner Puppe (1) began using the name "Gary Robert Randolph," a name petitioner Puppe obtained from a grave marker; (2) obtained a Minnesota identification card bearing his photograph and the name "Gary R. Randolph", (3) opened an account in the name of Gary R. Randolph at First Southdale National Bank (the "First Southdale account") using a false Social Security identification number; (4) and established a "mail drop" for Gary R. Randolph at 7726 Morgan Avenue South, Minneapolis, Minnesota, an address belonging to Tiffany's Secretarial Service, a provider of answering and mail services. Until September 15, 1979, petitioner Teats was employed as an accounting clerk by Magnetic Peripherals, Inc. ("MPI"), a subsidiary of Control Data Corporation. While she was employed by MPI, petitioner Teats had access to MPI's accounting and bill paying records. During *339 1979, while petitioner Teats was still employed by MPI, she entered into MPI's computer an identification number for the G. R. Randolph Company, so that the computer would recognize the G. R. Randolph Company as a company with which MPI did business. Petitioner Teats then created phony vouchers and receiving documents in the name of G. R. Randolph Company, a fictitious company name used by petitioner Puppe, and she submitted the phony documents to MPI. MPI issued five checks (the "checks") payable to the order of G. R. Randolph Company, in payment of the phony vouchers and receiving documents. The checks were mailed to the mail drop established by petitioner Puppe, and were dated and payable in amounts as follows: Check No.
Date
Amount
203643
August 1, 1979
$ 2,758.50  204077
August 2, 1979
38,920.10
204289
August 3, 1979
33,767.06
204617
August 6, 1979
30,506.32
210551
September 7, 1979
49,162.05
Total       $ 155,114.03
Petitioner Puppe picked up four of the checks and petitioner Teats picked up one of the checks. The checks were endorsed with a rubber Stamp that imprinted, For Deposit Only G. R. Randolph Co. *340 and/or Gary R. Randolph," and were deposited in the First Southdale account. (The scheme to cause MPI to issue the checks and the cashing of the checks hereinafter is referred to as "the embezzlement scheme.") The amounts deposited in the First Southdale account thereafter were withdrawn as follows. On August 14, 1979, petitioner Puppe withdrew $ 20,232.40 by cashier's check payable to International Coin, Inc., an Gary R. Randolph. On August 30, 1979, petitioner Puppe withdrew $ 25,500 in cash. On September 10, 1979, petitioner Puppe withdrew $ 21,245 by cashier's check payable to Northwest Territories. On September 21, 1979, petitioner Puppe made two separate withdrawals, one by cashier's check payable to Gary R. Randolph in the amount of $ 53,125, and the second of cash in the amount of $ 35,000. The amounts withdrawn from the First Southdale account were used as follows. The August 14, 1979, and September 10, 1979, cashier's checks each were used by petitioner Puppe to purchase 60 gold kruggerands, [4] or a total of 120 gold kruggerands--petitioner Teats received 60 of the 120 gold kruggerands purchased by petitioner Puppe, and petitioner Puppe kept the remaining 60 gold *341 kruggerands. In the fall of 1979, petitioner Puppe used some of the cash withdrawn to purchase three new automobiles--one for himself, one for petitioner Teats, and one for Mrs. Puppe (identical to the one he bought for petitioner Teats, except for the color). Some of the cash withdrawn was used to pay the expenses of a trip that petitioners Puppe and Teats took together. Petitioner Puppe took a portion of the cash withdrawn and placed it in a safety deposit box at Mid-American Bank. Petitioner Teats took a portion of the cash withdrawn and placed it in her safety deposit box. During late 1979, petitioner Teats deposited cash withdrawn from the First Southdale account in the amount of $ 15,000 in bank accounts in her name at banks located in the State of New York (the "New York bank accounts"). Petitioner Teats did not use her Minnesota address when she opened the New York bank accounts--instead, she used her brother's address. During late 1980, petitioner *342 Teats closed the New York bank accounts and transferred the funds to an account at Twin City Federal Savings and Loan ("Twin City account"). On March 11, 1980, Mrs. Puppe, at the direction of petitioner Puppe, entered the safety deposit box in which 60 gold kruggerands were stored and removed them. She then sold the 60 kruggerands at Northwest Territories Gold and Silver Exchange, Inc., for $ 34,080. The payment was requested and received in the form of four separate checks, each in an amount under $ 10,000. Mrs. Puppe then cashed the checks and returned the cash to the safety deposit box from which the kruggerands were removed. During April 1980, petitioner Teats filed her return for taxable year 1979. She failed to report as income on that return any of the funds paid by MPI pursuant to the embezzlement scheme and any interest income earned on the New York bank accounts. The joint return for petitioner Puppe and Mrs. Puppe was prepared by Mrs. Puppe and a professional tax return preparer. Mrs. Puppe signed her name and petitioner Puppe's name to the return, and mailed the return to the Internal Revenue Service Center at Ogden, Utah, while her husband was out of town. Although *343 petitioner Puppe did not sign the original joint return and had no opportunity to see it until after it had been filed, it was signed by Mrs. Puppe with his permission. When she filed the return, Mrs. Puppe was unaware of the embezzlement scheme. None of the funds paid by MPI pursuant to the embezzlement scheme were reported on that return. On September 9, 1980, petitioner Puppe entered into a contract to purchase a retail liquor business. The downpayment for purchase of the retail liquor business was $ 6,500, and was paid with funds withdrawn from petitioner Teats' Twin City account. The retail liquor business was assigned to and carried on by Pups, Inc. Pups, Inc., was a corporation formed by petitioner Puppe prior to October 25, 1980, and petitioner Puppe was its sole shareholder. Pups, Inc., adopted a fiscal year ending February 28. The books for Pups, Inc., were set up by petitioner Teats, who also worked as the corporation's bookkeeper. The following is a summary of the payments on behalf of Pups, Inc., and of deposits to the Pups, Inc., bank account: Down payment for the
purchase of the liquor
store business
9/9/80
$ 6,500.00 Start-up costs paid
9/9/80-12/26/80
3,036.44
Bank deposits
11/20/80
4,500.00
12/2/80
4,500.00
12/4/80
41,640.00
12/31/80
100.00
1/31/81
3,311.09
Total
$ 63,587.53
*344 The initial capitalization of Pups, Inc., came entirely from the funds obtained pursuant to the embezzlement scheme. In March 1982, petitioner Teats voluntarily reported the embezzlement scheme to the Hennepin County, Minnesota, authorities. Petitioner Teats also wrote a letter to the "Director of Internal Revenue," admitting her involvement in the embezzlement scheme, and stating that, to the best of her knowledge, she only received $ 30,000 of the funds paid by MPI pursuant to the embezzlement scheme. She also noted in the letter that she would file an amended return when she determined the amount she received. On or about April 1, 1982, the inventory and certain other physical assets of Pups, Inc., were seized as a result of a civil action brought by MPI against petitioners Puppe and Teats to recover the proceeds of the embezzlement scheme. At such time, the fair market value of the liquor inventory of Pups, Inc., was approximately $ 79,111.54, and the fair market value of the business of Pups, Inc., was approximately $ 200,000. On April 26, 1982, petitioner Teats pleaded guilty to the criminal charge of theft by swindle of over $ 2,500, in violation of Minn. Stat. sec. 609.52 *345 , subs. 2(4), 3(1&5), and sec. 609.05. On May 28, 1982, petitioner Puppe pleaded guilty to the same criminal charge. The charges to which petitioners Puppe and Teats pleaded guilty arose out of the embezzlement scheme. In late 1982, petitioner Puppe wrote a letter to petitioner Teats attempting to convince petitioner Teats to disclose as little as possible about the embezzlement scheme to the Internal Revenue Service. During April 1983, after petitioner Puppe had been contacted by an agent of respondent, petitioner Puppe and Mrs. Puppe filed an amended income tax return for 1979. Petitioner Puppe was advised by a tax return preparer to file the amended return in an attempt to avoid the fraud addition. That amended return set forth additional income from embezzled funds in the amount of $ 77,572, and a deduction for a net operating loss carryback from 1982. OPINION Deficiencies
In his separate notices of deficiency, respondent took an inconsistent, or whipsaw, position by determining that each petitioner should be taxed with 100 percent of the proceeds of the embezzlement scheme. Respondent's position on brief, however, is that "each [petitioner] should be taxable *346 on a pro rata share of the proceeds." [5]
Petitioner Puppe primarily contends that petitioner Teats fabricated the embezzlement scheme, that she embezzled the funds from MPI, and that any such funds he received were gifts from petitioner Teats. Based upon those factual contentions, petitioner Puppe contends that income arising out of the embezzlement scheme should not be taxed to him. Petitioner Puppe alternatively contends that in the event we conclude that he should be taxed with all or part of such embezzlement income, he had a net operating loss in 1982 because his stock in Pups, Inc., became worthless during that year, and that the net operating loss may be carried back to his taxable year 1979. Petitioner Teats' contention is the opposite of petitioner Puppe's primary contentions: that petitioner Puppe fabricated the embezzlement scheme, *347 that she acted at his direction when she submitted the phony documents to MPI, and that she did not receive any of the embezzled funds except as gifts from petitioner Puppe. Based upon her factual contentions, petitioner Teats contends that she should not be taxed on any income arising out of the embezzlement scheme. Each petitioner attempts to place responsibility for the embezzlement scheme on the other petitioner, and cites Bailey v. Commissiioner,52 T.C. 115 (1969), affd. per curiam 420 F.2d 777 (5th Cir. 1969), in support of his or her argument. In Bailey, we held that the taxpayer was liable for tax on the full amount of embezzlement proceeds she caused to be deposited in her brother's bank aaacount. That taxpayer had argued that her brother should have been taxed on such proceeds. Although we acknowledged in Bailey that the taxpayer's brother knew that the amounts placed at his disposal were embezzlement proceeds, we based our holding on the taxpayer's "complete dominion and control over the embezzled funds" and here beneficial enjoyment of such funds. [6] *348 52 T.C. at 119. Each petitioner in the instant case argues that the other petitioner should be taxed on the full amount of the embezzlement proceeds, as was the taxpayer in Bailey. Each petitioner further argues that he or she is in a position analogous to the "innocent" brother in Bailey. We find, however, that Bailey is distinguishable from the instant case, since both petitioners were involved actively in the embezzlement scheme; neither petitioner exercised independent control over the proceeds of the embezzlement scheme as did the taxpayer in Bailey.
Both petitioners Puppe and Teats pleaded guilty to identical charges. [7] Moreover, both were involved actively in carrying out the embezzlement scheme. Petitioner Teats used her employment relationship with MPI to cause MPI to issue the checks--she *349 did this by entering into the MPI computer an identification number for the fictitious entity set up by petitioner Puppe, and by submitting phony vouchers and receiving documents to MPI on behalf of the fictitious entity. Petitioner Puppe set up the vehicle for receipt, deposit, and cashing of the checks under a false identity--he did this by establishing the mail drop, the false identity, and the bank account. The inferences that we draw from the record as a whole are that the embezzlement scheme was fabricated jointly by petitioners Puppe and Teats, that they both were active participants in the embezzlement scheme, and that they intended to share the proceeds of the scheme. We are able to conclude on this record that out of the embezzlement proceeds, petitioner Puppe received 60 gold kruggerands, two automobiles (one for this wife), payment of expenses of a trip, and cash. Petitioner Teats *350 received 60 gold kruggerands, an automobile, payment of expenses of a trip, and cash. The record does not allow us to trace the proceeds of the embezzlement scheme with precision because the testimony of petitioners was inconsistent, vague, unconvincing, and biased. A further impediment to our ability to trace those proceeds is caused by petitioners' failure to keep records of the disposition of the proceeds. In Cannon v. Commissioner,533 F.2d 959, 960-961 (5th Cir. 1976), the court affirmed a Memorandum Opinion of this court [8] in which we made an approximation of the amount of income taxable to each of two taxpayers based upon a record that did not allow us to trace embezzlement proceeds to either one or both taxpayers, and in which we found that it was inappropriate to tax both taxpayers on all the proceeds. The court held that our "Solomon-like decision * * * to cut the baby in half" was appropriate under the circumstances. [9]Cannon v. Commissioner, Supra at 960-961. *351 We believe that it is appropriate to make such approximation in the instant case with respect to petitioners' respective sharing of the proceeds of the embezzlement scheme. See also Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930). [10] Based upon the record as a whole, we find that petitioners intended to share equally the proceeds of the embezzlement scheme. [11] Therefore, we hold that each petitioner is liable for tax on income equal to half of the embezzlement proceeds. We next address petitioner Puppe's claim that he is *352 entitled to carryback to 1979 a net operating loss arising out of the seizure of the asset of Pups, Inc. (hereinafter "the company") in 1982. Sections 172 and 1244 are the only authority cited by petitioner Puppe in support of his contention. Section 172(a) allows "as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryover to such year, plus (2) the net operating loss carrybacks for such year," and refers to such deduction as the "net operating loss deduction." The term "net operating loss" is defined by section 172(c) as "the excess of deductions allowed by this chapter over the gross income"; that excess must be computed by taking into account modifications that are set forth in section 172(d) (section 172(c)). Pursuant to the foregoing legal principles, we must determine whether there was a net operating loss that petitioner Puppe could carry to his taxable year 1979. Petitioner Puppe's briefs on this point are not helpful, but under any view of petitioner Puppe's case, we find that he did not have a net operating loss that could be carried to his taxable year 1979. For purposes of his claimed net operating loss, petitioner *353 relies upon the seizure of the assets of the company. Those assets were seized in 1982 as the result of a civil action brought to recover the funds embezzled from it. Petitioner Puppe only cites to sections 172 and 1244 as authority for his entitlement to a net operating loss for his taxable year 1982. Nevertheless, section 1244 does not, in itself, provide petitioner Puppe with a basis for a deduction in 1982; section 1244 only provides for ordinary loss treatment for a loss incurred on "section 1244 stock" if that loss would otherwise be treated as a loss from the sale or exchange of a capital asset. In the instant case, because assets were seized from the company and petitioner Puppe was the company's sole shareholder, it is apparent that petitioner Puppe is arguing, in essence, that he incurred a loss as a result of his stock in the company becoming worthless in 1982, and that such loss is deductible in 1982 pursuant to section 165 (g). Respondent counters, arguing that petitioner Puppe had no adjusted basis in his stock at the time of the seizure, and that petitioner Puppe therefore could not claim the deduction upon the occurrence of the seizure. Respondent alternatively *354 argues that even if petitioner Puppe could claim a deduction upon the occurrence of the seizure, that deduction could not result in a net operating loss in 1982 for petitioner Puppe, due to section 172(d)(4), which limits the use of nonbusiness deductions by taxpayers other than corporations for purposes of determining whether a net operating loss exists. We first will address respondent's argument concerning petitioner Puppe's adjusted basis in his stock in the company. Assuming arguendo that petitioner Puppe's stock in the company become worthless in 1982, the amount of his deduction for his loss would be "the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." Section 165(b). The evidence in this case indicates that the seizure of the company's assets constituted a "deemed distribution" to petitioner Puppe that reduced his basis in his stock to zero; therefore, even if petitioner's stock became worthless in 1982, petitioner Puppe would not be entitled to a deduction. It is well established that payments made by a corporation for the personal benefit of a shareholder are deemed distributions to the shareholder. *355 Simon v. Commissioner,248 F.2d 869, 876-877 (8th Cir. 1957); Truesdell v. Commissioner,89 T.C. 1280, 1293-1301 (1987); Falsetti v. Commissioner,85 T.C. 332, 356 (1985). Such distributions are characterized as dividends and taxed as ordinary income to the extent of the corporation's earnings and profits, and then, after the corporation's earnings and profits are exhausted, reduce the shareholder's adjusted basis in the stock of the corporation. Sections 61, 301, 316; Simon v. Commissioner, supra;Truesdell v. Commissioner, supra.
The record in the instant case indicates that contributions were made to, or payments were made on behalf of, the company during 1980 and 1981 that totalled $ 63,587.53. For purposes of this issue, we therefore treat petitioner Puppe as having had an adjusted basis of $ 63,587.53 in the stock of the company prior to the seizure of its corporate assets. [12]
*356 Then, in 1982, the assets of the company were seized in repayment of embezzled funds. It is clear that the seizure therefore was for the personal benefit of petitioner Puppe, and was a deemed distribution to him. The record in the instant case indicates that the company had no earnings and profits at the time of the seizure. [13] Therefore, the seizure of the company's assets would reduce petitioner Puppe's adjusted basis in the stock. The amount of the deemed distribution to petitioner Puppe would be equal to the fair market value of the property deemed distributed to him (see section 301(b)(1)(A)), or $ 79,111.54. Such distribution would reduce petitioner Puppe's adjusted basis in his stock to zero, and upon the occurrence of the event that petitioner Puppe claims caused his stock to become worthless, petitioner Puppe therefore would not be entitled to claim a deduction under subsections (b) and (g) of section 165. Moreover, as respondent alternatively argues on brief, even if petitioner Puppe could claim a deduction upon the occurrence of the seizure, that deduction *357 would not result in a net operating loss in 1982 for petitioner Puppe. As noted above, a net operating loss computation must take into account various modifications set forth in section 172(d). See section 172(c). One of the modification provisions, section 172(d)(4), provides, in relevant part, "In the case of a taxpayer other than a corporation, the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the gross income not derived from such trade or business." In the instant case, for purposes of a net operating loss computation for taxable year 1982, section 172(d)(4) generally is not applicable to a worthless security deduction to which section 1244 applies for loss characterization purposes. See section 1244(d)(3) ("any amount of loss treated by reasons of this section [1244] as an ordinary loss shall be treated as attributable to the trade or business of the taxpayer"); see also section 1.1244(d)-4, Income Tax Regs.[14] Nevertheless, since petitioner Puppe obtained his stock in the company with embezzled funds, upon such stock becoming worthless, a loss allowed by section 165(g) would be *358 treated as a nonbusiness deduction for purposes of section 172(d). See Mannette v. Commissioner,69 T.C. 990, 992-994 (1978). In Mannette v. Commissioner, supra, we held that a taxpayer who used embezzled funds to finance the purchase of securities was not entitled, under section 174(d), to treat a loss incurred as a result of the repayment of the embezzled funds as incurred in a trade or business. Rather, the loss incurred upon repayment of embezzled funds was found to be deductible under section 165(c)(2), as a loss incurred in a transaction for profit, and not under section 165(c)(1), as a loss incurred in a trade or business. We stated that a contrary result would be contrary to public policy because embezzlers could then convert nonbusiness embezzlement losses into business losses by the simple expedient of investing the embezzled funds in a business. *359 69 T.C. at 994. We also stated that "embezzlement is [not] * * * a proper activity arising from the 'rights and obligations' of a legitimate securities trader," and therefore could not be considered an aspect of any such trade or business. 69 T.C. 994. Assuming arguendo that petitioner Puppe incurred a loss under section 165(g) to which section 1244 was applicable for characterization purposes, the rationale of Mannette would apply to cause such loss to be characterized as a nonbusiness loss for purposes of section 172(d). We have scrutinized petitioner Puppe's tax return for his taxable year 1982, and find that due to the application of section 172(d)(4), petitioner Puppe would not have had a net operating loss for such year. Pursuant to the foregoing analysis, we hold that petitioner Puppe did not have a net operating loss for his taxable year 1982 that could be carried back to his taxable year 1979. [15]
*360 Fraud
We now turn to the issue of fraud. Respondent bears the burden of proving by clear and convincing evidence that a taxpayer underpaid his or her tax for the year in issue, and that some part of the underpayment was attributable to fraud. Section 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). For purposes of establishing that some part of an underpayment was due to fraud, respondent's burden is met if he is able to prove that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The existence of fraud is a question of fact to be resolved from the entire record. Rowlee v. Commissioner, supra;Gajewski v. Commissioner, supra; Otsuki v. Commissioner; *361 53 T.C. 96, 105-106 (1969). Fraud is never presumed, but rather must be established by some independent evidence of fraudulent intent. Kotmair v. Commissioner,86 T.C. 1253 (1986); Beaver v. Commissioner,55 T.C. 85 (1970). Direct proof of the taxpayer's intent is rarely available; therefore, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts. Spies v. United States,317 U.S. 492 (1943); Rowlee v. Commissioner, supra;Stephenson v. Commissioner,79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner, supra;Stone v. Commissioner, supra; Otsuki v. Commissioner, supra.
The following is a nonexclusive list of the "badges" of fraud that demonstrate fraudulent intent: (1) understating income; (2) keeping inadequate records; (3) failing to file tax returns; (4) giving implausible or inconsistent explanations of behavior; (5) concealing assets; (6) failing to cooperate with tax authorities; *362 (7) engaging in illegal activities; [16] (8) attempting to conceal illegal activities; (9) dealing in cash; and (10) failing to make estimated tax payments. Bradford v. Commissioner,796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. Moreover, we have held that the magnitude of the amounts embezzled and the method of embezzlement may preclude the inference that the embezzled income was omitted due to oversight. Estate of Nitto v. Commissioner,13 T.C. 858, 868 (1949). Respondent must carry his burden separately with respect to each petitioner; therefore, we will discuss the fraud addition separately with respect to each of them. *363 Petitioner Puppe
We find that respondent clearly and convincingly proved that petitioner Puppe underpaid his taxes for taxable year 1979, and that such underpayment was due to fraud. We first analyze the underpayment issue. Respondent must carry his burden for purposes of the fraud issue under the standard of clear and convincing evidence, yet he need only prove some underpayment -- he is not required to prove the precise amount of the underpayment. Section 7454(a); Rule 142(b); Stone v. Commissioner, supra.
The evidence in the instant case, however, clearly indicates that petitioner Puppe received income as a result of the embezzlement scheme. [17] Therefore, based upon the overwhelming evidence in the record, we find that petitioner Puppe underpaid his taxes for taxable year 1979. *364 Turning to the badges of fraud, we find that the following indicia of fraudulent intent are present in the instant case with respect to petitioner Puppe: (1) he participated in an illegal embezzlement scheme; (2) he attempted to conceal that embezzlement scheme from respondent (e.g., he initially kept the proceeds from the embezzlement scheme in an account under an assumed name, he purchased gold kruggerands and upon their subsequent sale, directed that the cash received from their sale be paid in denominations of less than $ 10,000; [18] and he kept substantial cash proceeds from the embezzlement scheme in a safety deposit box); (3) he failed to report substantial embezzlement income until after he was contacted by an agent of respondent; [19] (4) he failed to maintain adequate records; and (5) he failed to cooperate with respondent and attempted to persuade petitioner Teats to be uncooperative with respondent. These facts taken together clearly prove fraudulent intents. *365 Based upon the foregoing, we find that petitioner Puppe's underpayment of taxes for taxable year 1979 was due to fraud.
Petitioner Teats
We find that respondent clearly and convincingly proved that petitioner Teats underpaid her taxes for taxable year 1979, and that such underpayment was due to fraud. With respect to the existence of an underpayment, the evidence clearly indicates that petitioner Teats received income as a result of the embezzlement scheme. Thus, respondent clearly has shown that an underpayment exists in petitioner Teats' taxes for taxable year 1979. The following indicia of fraudulent intent are present in the instant case with respect to petitioner Teats: (1) she participated in an illegal embezzlement scheme; (2) prior to writing her letter to respondent, she attempted to conceal the embezzlement scheme from respondent (e.g. she established the New York bank accounts using her brother's address, failed to report the interest income from the New York bank accounts on her 1979 income tax return, and kept substantial cash proceeds from the embezzlement scheme in a safety deposit box); (3) she failed to report substantial embezzlement income; and *366 (4) she failed to maintain adequate records. While petitioner Teats did make a voluntary disclosure of the embezzlement income to the Internal Revenue Service in 1982, a significant length of time after amounts were embezzled from MPI, it is well established that "a taxpayer who submits a fraudulent return does not purge the fraud by subsequent voluntary disclosure; the fraud was committed, and the offense completed, when the original return was prepared and filed." Badaracco v. Commissioner,464 U.S. 386, 394 (1984). See also Plunkett v. Commissioner,465 F.2d 299, 302-303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. Based upon the record as a whole, we find that the underpayment of taxes by petitioner Teats was due to fraud. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. These cases were consolidated for purposes of trial, briefing, and opinion. ↩
2. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code of 1954 or the Internal Revenue Code of 1986, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. This amount includes an increase in the deficiency sought by respondent by way of amended answer. The increase is due to the abatement of an assessment determined by respondent to have been improper. Although the burden of proof is on respondent with respect to the increased deficiency (Rule 142(a)↩), such burden does not affect the outcome of the instant case. 4. The August 14, 1979, cashier's check was used to purchase 60 gold kruggerands from International Coin, Inc., and the September 10, 1979, cashier's check was used to purchase 60 gold kruggerands from Northwest Territories. ↩
5. Respondent has taken this approach in other cases. See, e.g., Gerardo v. Commissioner,552 F.2d 549, 556 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Opinion of this Court; Estate of Goodall v. Commissioner,391 F.2d 775↩ (8th Cir. 1968), affg. a Memorandum Opinion of this Court. 6. We therein cited Estatae of Geiger v. Commissioner,352 F.2d 221, 231-232↩ (9th Cir. 1965), affg. a Memorandum Opinion of this Court, for the proposition that a donor of embezzled funds may enjoy certain benefits as a result of exercising his dominion and control over the funds (e.g., favored acquaintances or a more favorable reputation). 7. As set out in our findings of fact, petitioners both pleaded guilty to "theft by swindle" under Minn. Stat. secs. 609.52 and 609.05↩. Under the latter section, petitioners pleaded guilty to the crime based upon actions that included aiding, advising, and conspiring with each other. 8. Ash v. Commissioner,T.C. Memo. 1974-219↩. 9. The United States Court of Appeals for the Second Circuit, commenting on the procedure utilized in Cannon, set the biblical reference straight: The equal proration of income among those participating in the activity that generated the income has been somewhat imprecisely referred to, in the context of an equal division between two participants, as a "Solomon-like decision * * * to cut the baby in half." See Cannon v. C.I.R., supra,533 F.2d at 960. Of course, the wisdom of King Solomon's decision was that it only threatened to divide the baby, thereby precipitating identification of the true mother--the claimant who relinquished her claim in the face of the threatened division. See I Kings 3:16-28. In Cannon, as in the pending case, the Tax Court made an actual division.
Schaffer v. Commissioner,779 F.2d 849, 851 n. 2 (2d Cir. 1985). We note that in the case of King Solomon's decision, both mothers wanted the baby. In the instant case, however, neither petitioner claims any right to the "baby." ↩
10. The same result might also be reached by characterizing the embezzlement scheme as a joint enterprise and resorting to partnership principles to allocate the income. See Schaffer v. Commissioner,779 F.2d 849 (2d Cir. 1985), affg. a Memorandum Opinion of this Court; Cipparone v. Commissioner,T.C. Memo. 1985-234↩. 11. On cross-examination by petitioner Puppe's counsel, petitioner Teats testified as follows: Q And is it a fair statement in your opinion to say that the proceeds of the embezzlement were divided more or less evenly between you and Mr. Puppe? A It was, yeah. I believe so. ↩
12. Not all of petitioner Puppe's contributions to the company were made prior to, or at, the time the company's stock was issued. It therefore is clear that for purposes of ordinary loss treatment under section 1244, petitioner's basis in his stock would not be $ 63,587.53, because an increase in the basis of outstanding stock as a result "of contributions to the capital of the corporation, or otherwise," is treated as allocable to stock that is not section 1244 stock. Section 1244(d)(1)(8); see also section 1.1244(d)-2(a), Income Tax Regs.↩
13. In fact, petitioner Puppe does not dispute on brief that the company had no earnings and profits. ↩
14. See also Coldiron v. Commissioner,T.C. Memo. 1987-569 (indicating that loss allowed by section 165(g) may be characterized as ordinary under section 1244↩). 15. On brief, petitioner Teats argues for the first time that she is entitled to use the income averaging provisions of the Code for her taxable year 1979. Respondent objects on brief to petitioner Teats raising that issue in such manner. We will not consider the income averaging issue because respondent would suffer prejudice by the raising of the issue so late in these proceedings. See Leahy v. Commissioner,87 T.C. 56, 64-65↩ (1986). 16. We have held that a fair inference of a person's intent to evade tax may be drawn from the fact that a person misappropriated another's funds through misrepresentation and concealment, because such a person would not hesitate to misrepresent and conceal those funds from the government. McGee v. Commissioner,61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied, 424 U.S. 967 (1976); see also Rogers v. Commissioner,111 F.2d 987↩ (6th Cir. 1940).
17. Such income clearly is taxable ( James v. United States,366 U.S. 213 (1961)), and petitioner Puppe and Mrs. Puppe failed to report such income on their initial return for their taxable year 1979. Moreover, reporting that income on an amended return does not affect a determination concerning whether an underpayment of tax exists for purposes of section 6653(b). Section 6653(c)↩. 18. Petitioner Puppe apparently was attempting to avoid Federal laws requiring that certain currency transactions be reported. See 31 U.S.C. section 5313↩, and the regulations thereunder. 19. Even though petitioner Puppe filed an amended return, such action does not mitigate any fraud he perpetrated in the filing of his original return. See Stewart v. Commissioner,66 T.C. 54, 59↩ (1976), and cases cited therein.